IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

[PHILADELPHIA, DECEMBER 29, 1828.]

## BOLIN and others *against* HUFFNAGLE, Assignee, &c.

If goods are shipped on credit, in a foreign port, on board the consignee's own ship, the master of which signs a bill of lading, by which they are to be delivered to his owner, the *transitus* is at an end by delivery to the master; and the consignor cannot afterwards stop the goods, in case of the insolvency of the consignee before their arrival.

THIS was an action of replevin brought in this court by Messrs. *Bolin*, *Leach*, and *Gatewood*, against *Huffnagle*, assignee of Messrs. *Sperry* and *Stansbury*, for a quantity of wines and raisins. The following case was stated for the opinion of the court:

In *September*, 1822, the plaintiffs, in pursuance of an order from Messrs. *Sperry* and *Stansbury*, dated the 15th of *July*, 1822, shipped at *Malaga* in *Spain*, on board the brig *Pleiades*, then belonging to the said *Sperry* and *Stansbury*, and commanded by *Charles King*, master, in their employment, certain *Malaga* wines and raisins, consigned to the said *Sperry* and *Stansbury*, merchants, at *Philadelphia*. On the 31st of *October*, in the same year, before the said vessel arrived at *Philadelphia*, and before any intelligence was received of the said shipment, the said *Sperry* and *Stansbury* became insolvent, and executed a general assignment to the defendant, for the benefit of their creditors. On the 28th of *November*, in the same year, the said vessel arrived in the *Delaware*, and on that day was detained at *Newcastle*, in the state of *Delaware*, by the service of a writ of replevin, at the suit of the plaintiffs, of which the defendant and *Sperry* and *Stansbury*, had notice at *Philadelphia*; and the said Captain *King* was notified by *R. Gatewood*, one of the plaintiffs, not to deliver the goods. It

(Bolin and others *v.* Huffnagle, Assignee, &c.).

was then agreed, that the said wine and raisins should be sold under the direction of both parties, and the nett proceeds of sale deposited in bank to the credit of the respective attornies, to await the decision of the question, whether the said property and the proceeds thereof, belong to the said plaintiffs or to the said defendant? The nett proceeds of the said wine and raisins have accordingly been deposited in bank to the credit, &c.; and it is agreed that the court shall enter judgment for the party whom they shall consider to be entitled to the said proceeds.

The order referred to in the case stated, was as follows:

*" Philadelphia, July,* 15th, 1822.
*Malaga.*
    Messrs. *Bolin, Leach,* and *Gatewood.*
Gentlemen,
   Your Mr. *Gatewood,* we have had the pleasure to see, and received his assurance of your exertions to procure a freight for our brig, should she proceed to *Malaga.*
 We should prefer a freight to any part of the *United States,* not farther east than *New York,* or south than *Norfolk;* but, if a good freight offers for *New Orleans,* we have no objections. If direct to *Philadelphia,* we have no objections, as we informed your partner, Mr. *Gatewood,* to receive on our account, to the extent of about three thousand dollars, in first quality dry *Malaga* wine, cask raisins, and bloom raisins, an equal proportion of each, for which we will accept your draft in his favour at four months sight.
    We remain, &c.
     (Signed)   *Sperry* and *Stansbury."*

The following, is an abstract of the bill of lading:
*" S. S.* Shipped by *Bolin, Leach,* and *Gatewood,* in and upon the *Pleiades, Charles King,* master, now in the mole of *Malaga,* bound to *Philadelphia,*
    50 qr. casks *Malaga* wine, &c. &c.
to be delivered at the port of *Philadelphia,* unto Messrs. *Sperry* and *Stansbury,* or to their assignees, they paying freight for the said goods nothing, being the owners of the said vessel.
   Dated in *Malaga,* the 23d of *September,* 1822.
     (Signed)   *Charles King."*

Abstract of the *Invoice.*
*"* Invoice of raisins shipped on board the brig *Pleiades, Charles King,* master, bound to *Philadelphia,* by order of *Horatio Sprague,* esq., for account and risk of Messrs. *Sperry* and *Stansbury* of *Philadelphia.*
  *S. S.* 100 casks of sun raisins, &c. &c.
 (Signed)  *Malaga, September,* 23d, 1822.
     *Bolin, Leach,* and *Gatewood.*

(Bolin and others *v.* Huffnagle, Assignee, &c.)

*Dunlap,* for the plaintiffs.—The insolvency of Messrs.. *Sperry* and *Stansbury,* before the goods purchased by them came into their possession, gave to the plaintiffs a right to stop them *in transitu.* This right, founded on principles of natural justice, was at an early period established in equity. It was adopted so long ago as 1690, in the case of *Wiseman* v. *Vandeput,* 2 *Vern.* 203, which, in its gene-ral principles, has never been departed from.· *Snee* v. *Prescott,* 1 *Atk.* 245, decided in the year 1743, is a leading case; in which Lord HARDWICKE established the rule, that the vendor might re-sume the possession of goods consigned to the vendee, before deli-very, in case of the bankruptcy of the vendee: and in 1761, in *D'Aquila* v. *Lambert, Ambler,* 399, the rule was again adopted; and Lord.NORTHINGTON declared, that it had been determined on the most solid reasons, that the goods of one man ought not to be applied to the payment of another man's debts. This doctrine, ori-ginally derived from equity, is now fully established at law, as will be found in *Abbott on Shipping* (*Story's Ed.*) *Part 3, Ch.* 9, where the cases are collected, and their principles explained. In such cases the question always is, whether or not the transit is ended; for until it be ended, the vendor's right to stop the goods continues. The result of all the decisions, from 1690 down to the present day is, that nothing short of actual possession by the ven-dee, will divest the unpaid vendor of his right to reclaim the goods. Even delivery to a carrier, or warehouseman, or a packer appointed by the consignee, or a wharfinger who receives them on the part of the consignee, to be forwarded to him, leaves the pro-perty subject to this right of the consignor; nor is it affected by part payment of the price. *Hodgson* v. *Loy,* 7 *T. R.* 440. *Fiese* v. *Wray,* 3 *East,* 93. *Oppenheim* v. *Russell,* 3 *Bos. & Pull.* 42. *Stokes* v. *La Riviere,* and *Hunter* v. *Beal,* cited in 3 *T. R.* 466. In the latter of these cases Lord MANSFIELD was clearly of opinion, that although the goods might be legally delivered to the vendee for many purposes, yet for this purpose, there must be an absolute, actual possession; they must come to the *corporate touch* of the vendee, otherwise they may be stopped *in transitu:* deli-very to a third person, to be conveyed to him, is not sufficient. It is true that in *Ellis* v. *Hunt,* 3 *T. R.* 464, the transit was considered as ended before actual delivery; but the goods had ar-rived in *London;* and been marked with the consignee's private mark; which made it the strongest possible case of constructive de-livery. The general principles of the doctrine, as previously esta-blished, were, however, fully supported by the unanimous opinion of the judges. The case of *Boehtlinck* v. *Inglis,* 3 *East,* 381, is much in point. There, a ship was chartered for a voyage to *Russia,* and goods were shipped on account, and at the risk of the freighter, to whom bills of lading and invoices of the cargo were sent; and it was held that delivery on board a ship thus chartered, did not divest the consignor of his right to stop the goods on their way to the ven-

dee, in case of his insolvency at any time before actual delivery, any more than if they had been delivered on board a general ship for the same purpose. But the very question now under consideration was determined in *Stubbs* v. *Lund*, 7 *Mass. Rep.* 453, by Chief Justice PARSONS, who decided that where a merchant, in pursuance of a previous general agreement, had shipped goods on credit to one, who, after the shipment became insolvent, the shipper had a right to stop the goods *in transitu.* The right of stopping *in transitu,* goods shipped on the credit and at the risk of the consignee, continues, according to that case, until they come into his actual possession, at the end of the voyage, unless he has previously sold them and assigned the bill of lading to the purchaser. This doctrine was considered as applicable, as well to the case of a ship hired or owned by the consignee, as to that of a general ship, whereever the actual possession of the goods by the consignee is provided for by the bill of lading. If, however, the goods are shipped for a foreign market, and are not to be transported to the consignee, the right to stop *in transitu* ceases on the shipment. In *Ilsley* v. *Stubbs,* 9 *Mass. Rep.* 65, the doctrine of stoppage *in transitu* again came under the consideration of the court, when the principles laid down by Chief Justice PARSONS in the case just cited, were adopted and enforced by SEWALL, J. And in *Scholfield* v. *Bell,* 14 *Mass. Rep.* 40. PARKER, C. J., declares, that the consignor may at any time before the actual delivery of the goods according to their destination, rescind the contract, and resume the property, in prejudice of any creditor of the consignee, and even against assignees in the case of bankruptcy.

*Lowber* and *Binney,* for the defendants.

That there is no doctrine more artificial than that of stoppage *in transitu,* is proved by the inconsistencies into which the courts have fallen in relation to it, and the conflict of opinion in respect to its origin. Those who have thought most upon the subject, have had the greatest difficulty in discovering the source from which it sprang. Some have referred it to equity, others to law, while Lord HARDWICKE put it upon neither equity nor law, but the custom of merchants; and if such a mind as his was perplexed with the doctrine, as it appears to have been in the case of *Snee* v. *Prescott,* 1 *Atk.* 245, it must have been because no good reason could be found at the bottom of it. Its origin is to be traced, rather to a supposed feeling of natural justice, than to any legal source. But even upon this foundation, it cannot be supported; for whatever may be the impulse in favour of one who has parted with his goods, without having received the price of them, a disciplined and reflecting mind, can perceive no more justice in protecting the rights of him whose goods are on their way to the vendee, than of him, whose property has come into his possession. In point of natural justice, they stand upon equal ground. Both have parted with their goods on the credit of the vendee, and both remain unpaid. But, whatever may

have been the origin of the rule, and however doubtful its equity, it cannot be denied that such a rule does exist; though it has been thought by at least one learned judge, Sir ALAN CHAMBRE, (4 *Bos. & Pull.* 72,) to have been already carried far enough.

The only question is, whether the *transitus* was ended by the delivery of the goods in question, on board the *Pleiades* at *Gibralter*, or continued until her arrival at *Philadelphia;* and to determine this question in favour of the defendant, two propositions must be established.

1. That the *transitus* is at an end whenever the goods are delivered to the special agent of the consignee.

2. That the master of the consignee's own ship, is such an agent.

1. The continuance of the right of stoppage *in transitu*, is limited to the period during which the goods are in the hands of a mere middle man, the agent of both parties, while on their way to the vendee, or to some person or place specially appointed by him. The same person may be either a middle man, or the special agent of the vendee. It is his character in relation to the particular transaction, which determines the vendor's right to reclaim the goods. The vendor himself may be such special agent, and hold the property for the use of the vendee, as was the case in *Barrett* v. *Goddard,* 3 *Mason,* 107. The idea expressed by Lord MANSFIELD, in which he at first seems to have been supported by Lord KENYON, that the corporal touch of the vendee was necessary to put an end to the transit, has never been adhered to. It is regarded as a figurative expression, the use of which has frequently been regretted. *Lawes on Charter Parties,* 493. There are many cases which illustrate the position contended for. Delivery to a packer, as a middle man, it has been held, does not terminate the *transitus. Hunt* v. *Ward,* cited in *Ellis* v. *Hunt,* 3 *D. & E.,* 467. But it is terminated by delivery to a packer, in whose hands the goods are subject to the control of the vendee. *Leeds* v. *Wright,* 3 *Bos. & Pull.* 320. The same principle governed the case of *Scott* v. *Pettit,* 3 *Bos. & Pull.* 469. So, if goods be delivered to a wharfinger, who is a middle man, the consignor may stop them before they reach the consignee. *Mills* v. *Ball,* 2 *Bos.* & *Pull.* 457. But if a man be in the habit of using the warehouse of a wharfinger, as his own, and make that the depository of his goods, and dispose of them there, it seems that the *transitus* ceases when they arrive at such warehouse. *Richardson* v. *Goss,* 3 *Bos. & Pull.* 119. The same distinction will be found in *Hurry* v. *Mangles,* 1 *Campb.* 452. *Harman* v. *Anderson,* 2 *Campb.* 243, and *Oppenheim* v. *Russell,* 3 *Bos.* & *Pull.* 42. The slightest circumstances have been considered sufficient to put an end to the right. Such as marking the goods. *Ellis* v. *Hunt,* 3 *D. & E.* 464; or weighing them. *Hammond* v. *Anderson,* 4 *Bos. & Pull.* 69; or taking samples: *Wright* v. *Lawes,* 4 *Esp.* 82.

" If any thing remains to be done, on the part of the seller, as between him and the buyer," says Lord ELLENBOROUGH in *Hanson* v. *Meyer*, 6 *East*, 629, "before the commodity purchased is to be delivered, a complete present right of property has not attached in the buyer; and this action, (trover for the goods by the assignees of the vendee,) which is accommodated to, and depends upon such supposed perfect right of property, is not maintainable." The converse of the proposition is, of course, also true.   This rule has been the criterion of the subsequent decisions on this subject. The right to stop the goods does not continue until they reach the residence of the consignee, or the place to which he destines them. It ceases when they have reached the destination agreed upon between him and the vendor, though they have not reached their ultimate destination.   *Dixon* v. *Baldwen*, 5 *East*. 175.   It is, in some cases, at an end, even where the property remains in the hands of the vendor himself, as in the case already cited, of *Barrett* v. *Goddard*, 3 *Mason*, 107, where the goods were sold on credit, and by  agreement with, the vendor, they remained in his stores until the vendee became insolvent; and that of *Elmore* v. *Stone*, 1 *Taunt*. 458, where the purchaser agreed to give a certain price for a pair of horses, upon which the seller, who was a livery stable keeper, and dealt in horses, removed them from his sale stable to another stable.   In both these cases it was determined, that the absolute property had vested in the buyer. All the cases establish the principle, that whenever the goods come into the hands of the particular agent of the vendee, and there is no longer any privity between him and the vendor, the right to reclaim them is gone.

2. Was the delivery on board the consignee's own ship, to his own master, a delivery to himself?   It is precisely the same as a delivery at the vendee's warehouse, which, it has been seen, terminates the *transitus*.   There was, in this case, no privity between the consignor and the master, nor had the former the slightest control over the latter.   The master was amenable to, and subject to the orders of the consignee alone.   He was his servant.   All the elementary writers concur in this. *Abbott on Shipping*, 361, 362. *Holt on Shipping*, 210, 211.   *Lawes on Charter Parties*, 532, 534.   This doctrine has been carried farther than it is now necessary to contend for.   In *Fowler* v. *M'Taggart*, cited in 1 *East*, 522, it was decided, that delivery on board a vessel, chartered by the consignee for three years, was a delivery to the consignee himself.   This principle was fully recognized in *Inglis* v. *Usherwood*, 1 *East*, 515; but, as in that case the delivery was on board such a ship in *Russia*, by the laws of which country, the owner of the goods had a right, on the bankruptcy of the vendee, to take back his goods, it was determined, that the assignees of the vendee, who had become bankrupt before the arrival of the ship home, were not entitled to them.   In these cases, the principle that a ship chartered

(Bolin and others *v.* Huffnagle, Assignee, &c.)

for a term of years, is constructively the ship of the charterer, was fully established; though the latter case was taken out of it by the *Russian* ordinance.   The case is much stronger, where, as in the present instance, the vessel is the actual property of the consignee. Lord KENYON, in *Boehtlinck* v. *Schneider*, 3 *Esp.* 58, considered delivery on board a ship chartered merely for the voyage, sufficient to divest the right to stop the goods.   But that case has been overruled by *Boehtlinck* v. *Inglis*, 3 *East*, 381, and the distinction is now well settled between a vessel chartered for a term, and one chartered for the voyage.  *Mercardier* v. *Chesapeake Ins. Co*, 8 *Cranch*, 39. *Phill. on Ins.* 242.  In *Stubbs* v. *Lund*, 7 *Mass. R.* 453, cited on the other side, Chief Justice PARSONS, who was more distinguished as a common, than as a commercial lawyer, departed from the land marks previously set; added to which, the circumstances of the case showed an assent to the stoppage.   There is nothing in the cases previously decided, like the distinction taken by that learned judge, between a shipment of goods, to be delivered to the consignee, and one of goods to be delivered at a foreign port.   There is neither authority nor principle for such a distinction.  *Stubbs* v. *Lund* was the guide to the subsequent decision of *Ilsley* v. *Stubbs*, *Mass. R.* 65, by SEWEL, J., who, besides, states that the goods were under the control of the consignors at the time they were stopped.    If in the case of *Coates* v. *Railton*, 6 *Barnw. & Cressw.* 422, it was intended to say, that where goods come into the hands of the vendee, whose intention it is to send them to a foreign port, the vendor may stop them, it is going too far.   But, if it was only meant, that the right continues until their arrival at their ulterior place of destination, where that destination has been agreed upon between the vendor and vendee, it was right. The case professes to be in accordance with previous decisions, which if more than the latter position was intended, it departs from.

*Chauncey* in reply.—The question now under consideration has never been directly decided, except, perhaps, in *Massachusetts.* The circumstances of the case are, that the owners of a ship in *Phi-ladelphia*, addressing themselves to their correspondents in a foreign port, where the ship is, declare their willingness to receive goods to a certain amount, on their own account, provided a freight to *Philadelphia* can be procured, and state that they will accept a draft in favour of one of the partners of the foreign house, in payment.   The goods are shipped, but before their arrival, the consignees become insolvent, and the consignors claim the right to have their goods back again. .  If there be any value in the principle of stoppage *in transitu*, it must be available in this case, which is that of taking the goods of Messrs. *Bolin*, *Leach*, and *Gatewood*, to pay the debts of Messrs. *Sperry* and *Stansbury*.   The doctrine of stoppage *in transitu*, is reasonable, because it is founded in honesty.   The extension of commerce required its introduction.   It is derived, not from the common, but the civil law, though the latter extends it to all cases in which the price remains unpaid.   It is

(Bolin and others *v.* Huffnagle, Assignee, &c.)

at variance with some principles of the common law, and therefore is supposed to have been derived from equity. But whatever may have been its origin, it is now fully established as a legal doctrine. The great object is to secure the interest of a vendor who has sold goods on the faith of the solvency of a distant vendee, who becomes insolvent before they reach him. Some ambiguity has arisen from confounding the doctrine of stoppage *in transitu*, with that of lien. They are, however, distinct doctrines. The former takes place, where the title and possession have passed from the vendor, and is founded on the right to resume the goods before they reach the vendee. The latter can only exist while the property remains in the possession of the party who asserts the lien. The class of cases, therefore, which has been cited, establishing the position, that where every thing has been done between the vendor and vendee, such as weighing, marking, &c., the vendor cannot retain the goods on the insolvency of the vendee, belongs to the doctrine of liens, and is inapplicable to the point under discussion. Such was the case in 3 *Mason*, 109. Lord MANSFIELD has said, that to divest the right of stoppage, the goods must come to the corporal touch of the consignee. In this he was followed by Lord KENYON, who, it is true, afterwards regretted the expression; but it has been declared again and again by different judges, that the right is divested only by actual possession. This language, however, is perhaps rather too strong, as there are cases in which constructive possession has been held to terminate the transit. The right of stoppage exists in all cases where the goods are delivered *to any one* to be delivered to the vendee, and while they are in transit to him. It does not cease until they reach him, or are subject to his control. If they are *in transitu*, it does not matter in what vehicle of conveyance, or in whose hands as servant or agent they may be. The term *middle man* does not signify a person representing both interests. Such an agent cannot represent the vendor. The master of a general ship, which is undisputed ground, does not represent the consignor. There is no privity between them. Nor does a packer, a wharfinger, or a carrier represent both parties. Nothing more is meant by the term middle man, than that he is the channel of transportation, in whose possession the goods may be stopped. The object of the delivery to an agent, and not the character of the agent, is the criterion. Where the goods are delivered for *transportation*, the right continues though the agent be a special one; but where they are delivered to special agent to *exercise dominion over and to dispose* of them, the case is different. This view of the subject reconciles all the seemingly contradictory cases. There is no case in the books of a delivery on board the consignee's own ship, but the principle contended for is applicable to such a case. It is admitted in the opposite argument, that delivery on board a general ship or one chartered for the voyage, does not prevent the consignor from resuming the property; but it has been held in *Fowler* v. *M'Taggart* that he

· (Bolin and others *v.* Huffnagle, Assignee, &c.)

cannot do so after a delivery on board a ship chartered for three years. This is a solitary case which cannot countervail the principles established by various other decisions. Besides, there were peculiar circumstances in that case. . The goods were delivered on board to be sent abroad to merchandize. They were under the control of the vendee, and therefore as much in his possession as if they had been deposited in his own warehouse. There is a wide difference between that case and the one under consideration. Messrs. *Sperry* and *Stansbury* agreed to receive on their own account the wine and raisins, provided the ship should proceed directly to *Philadelphia.* The object of the delivery on board was transportation to *Philadelphia.* The master who received the goods was an agent for that purpose merely, and had no control over them whatever. This principle served as the guide of Chief Justice PARSONS in *Stubbs* v. *Lund,* the authority of which has been upheld by subsequent decisions of the same court. And this is not the first time that a question of commercial law, after having been beating about for years in *Westminster* Hall, has in this country, found its true principle, which has afterwards been recognized by *English* courts.

The opinion of the court was delivered by

ROGERS, J.—The facts on which the question arises are particularly set forth in the case stated. It is agreed, that unless the plaintiffs, under the circumstances, had a right of stoppage *in transitu,* the assignee is entitled to the money. Without entering into a general discussion of the law of stoppage *in transitu,* it may be sufficient to observe, as a preliminary remark, that as between the original consignor and consignee, it is now clear, that the consignee has a right to seize the goods in their transit or passage from the consignor to the consignee, if the consignee, before they are delivered, becomes insolvent.

This right is now well established by law; although the extent of the doctrine has been a matter of frequent discussion, and some difficulty.

The general right being admitted, the inquiry will be, whether this case comes within the principles of the judicial adjudications. To whatever principles the right of stoppage *in transitu* be referred, it is plain, that if the goods be once *actually delivered* into the possession of the consignee or purchaser, the property is thereby absolutely vested in him. It is the same if the delivery be to his servant or correspondent authorized by him to receive the goods; for the possession of either of them, is, in law, a delivery to the consignee himself. The question always is, whether the party to whom the goods actually came be an *agent,* so far representing his principal, as to make the delivery to him, a *full, effectual,* and *final* delivery to the principal, as contra-distinguished from a delivery to a person virtually acting as a carrier, or mean of

(Bolin and others *v.* Huffnagle, Assignee, &c.)

conveyance to, or on account of the principal, in a mere course of transit towards him. *Dixon* v. *Baldwen,* 5 *East,* 184.   *Lawes on Charter Parties,* ch. 3, 492. *Brown's Law of Sales,* 451. 4 *Esp.* 243.   *Leeds* v. *Wright.*

If these principles be fairly deducible from the cases, and that they are is abundantly plain, from the instances I have cited, then this, independently of some cases which the industry of counsel has pressed into their service, may be considered as a question of easy solution.   The relation of the master is that of a special agent to his employer.   He so far represents his principal, as to make a delivery to him, (in the absence of a special agreement to the contrary,) a full, effectual, and final delivery to the principal himself. The master of the ship cannot, with any propriety, be considered as a common carrier, or mere middle man, between the consignor and consignee.   He is under the absolute control of *Sperry* and *Stansbury,* liable to be dismissed at their will and pleasure, in the same manner as any other servant may be discharged from the service of his employer.   After the delivery of the goods, at *Malaga,* to the captain, *Bolin* and Co. ceased to have any control over them.   Every connexion between the vendors and the agent was at an end, and the agent became alone answerable to his employers.   Nor, had the agent any demands against the vendors.   Not so in the case of a common carrier or middle man, who, for certain purposes, is considered as the agent of both parties, and, against whom, in certain cases, either the vendor or vendee would have a right of action. So, also, in the event of the insolvency of the vendee, or refusal to take the goods, a common carrier would have an action against the vendor for his freight.   So much is the master considered as the special and exclusive agent of his employer, that in no case would he have been justified in a redelivery of the goods to the vendors. This being the law, it is a difficult matter to distinguish such a' delivery from one made in a man's warehouse, particularly if the warehouse be not at the place of his abode.   Indeed I do not understand this to be denied, but the counsel for the plaintiffs seek to place this case on different grounds.   It has been strenuously contended, that the right of stoppage *in transitu* exists in all cases where the goods have been delivered to any one for transportation, and continues until they reach the vendee, and are subject to his dominion, and it matters not in what way they are transmitted, or what agents are employed.

*Brown,* in his treatise on the Law of Sales, 506, deduces this principle from an elaborate review of all the authorities. " It seems clear," says the learned author, " that the reason why goods are liable to be stopped in the hands of a carrier or packer, is not because a delivery to such person on account of the vendee is only a constructive delivery, but because it is a delivery for the purpose of transport, or in the course of the conveyance of the goods to the vendee."

(Bolin and others *v.* Huffnagle, Assignee, &c.)

The general rule, therefore, seems to be, not that the goods may be stopped after a delivery merely constructive, and that nothing short of an actual delivery vests the property indefeasibly in the vendee, but that the state of *transitus* is put an end to by delivery either actual or constructive, and that it is only when the constructive delivery is for the purpose of transport, or is connected with the transmission of the goods, that an exception is admitted to this rule, and that they remain liable to stoppage after such delivery. In all other cases, constructive delivery is equally effectual as actual delivery to put an end to the state of *transitus.* Instead of its being a general rule, therefore, that goods are liable to stoppage after a delivery merely constructive, the general rule seems to be exactly the reverse, and it is merely an exception to the general rule, that goods are liable to stoppage after a constructive delivery to a carrier.

. If this be the true rule, it is incumbent upon the plaintiffs to bring themselves within the benefit of the exception. The case finds, that *Sperry* and *Stansbury,* to whom the goods were consigned, were the owners of the ship of which Captain *King,* to whom the goods were delivered, was master. I think nothing of the phraseology of the bill of lading, to be delivered to *Sperry* and *Stansbury*.. It is a mere form of expression, and was not intended to vary the ordinary mode of delivery to a known agent, nor was it meant as a special reservation of a right of stoppage *in transitu,* until, in the language of Lord MANSFIELD, they shall come to the corporal touch of the vendees. Nor do I think there is any thing in the letter of instructions, which differs this from the common course of dealing between vendor and vendee. In the bill of lading, the consignors recognize the relation in which Captain *King* stood to his employers, who were the owners of the ship, which is altogether inconsistent with the character of a common carrier, used as a mere means of transportation between the vendor and vendee. I look upon this not as a case of constructive, but of *actual* delivery, and in this opinion I am supported by Mr. *Lawes* in his work on Charter Parties and Stoppage *in Transitu,* page 492, where an actual delivery is spoken of in opposition to a constructive or supposed delivery to some third person (not the immediate agent of the vendee or consignee) for the purpose of forwarding the goods to him or his agent. Mr. *Bell* also uses the terms actual delivery in the same sense. "Actual delivery," says the commentator, No. 127, "is held, commonly, to imply two distinct acts: the ceding the corporal possession by the seller or his servants, and the actual apprehension of corporal possession by the buyer or his servants, or by some person authorized by him to receive the goods, as his representative for the purpose of disposal, or of custody, not of mere conveyance." To the same effect is *Brown* in his treatise on sales, 451. Actual delivery, then, I understand to consist in the giving real possession of the thing sold to the vendee or his servants, or spe-

(Bolin and others *v.* Huffnagle, Assignee, &c. )

cial agents, who are identified with him in law, and represent him. Constructive delivery is a general term, comprehending all those acts, which although not truly conferring a real possession of the thing sold on the vendee, have been held *constructione juris,* equivalent to acts of real delivery.    In this sense constructive delivery includes symbolical delivery, and all those *traditiones fictæ,* which have been admitted into the law as sufficient to vest the absolute property in the vendee, and bar the rights of lien and stoppage *in transitu;* such as marking and setting apart the goods as belonging to the vendee, charging him with warehouse rent, &c.

Whilst, therefore, I accede to the principle, not, however, to the extent claimed by the plaintiffs, I altogether deny its application to the circumstances of this case.    In all cases of *actual delivery* the *transitus* ceases; so, also, in some where the delivery is merely constructive.    The doctrine of Lord MANSFIELD, that the *transitus* continues until the goods come to the corporal touch of the vendee, and of *Buller,* that they must come into his actual possession, has been long since exploded.    The extent of the doctrine in relation to constructive delivery it is unnecessary to trace.    It will be sufficient for us, and more safe, to confine ourselves to the question at issue between the parties.    I shall now proceed to inquire how far the authorities are in accordance with these principles.    We do not think it necessary, nor indeed proper, to examine all the decisions from *Snee* v. *Prescott,* which is the leading case, but shall content ourselves with noticing such as have an immediate bearing on the question; nor indeed, should we think any further investigation required, were not this, in some measure, untrodden ground in our courts.    Those who are desirous of seeing a complete examination of the law of stoppage *in transitu,* will be amply gratified by a resort to the elementary treatises of *Abbott* on *Shipping, Lawes on Charter Parties,* and particularly to *Brown's* learned treatise on the *Law of Sales.*

The first case, and certainly the most important, which immediately bears on the question, is *Fowler* and *M'Taggart,* the proper name of which is said to be *Fowler* or *Kymer, et al,* and was tried before Mr. Justice GROSE, at *Bristol.*    The bankrupts, *Hunter* and Co. were in possession of a ship let to them for a term of three years, at fifty-two pounds and ten shillings per month, they finding stock and provisions for the ship, and paying the master; during which time they were to have the entire disposition of the ship, and the complete control of her.    The ship, (it appears in the statement of the case, which is given, as is said, more particularly in 3 *East,* 396, *Boethlinck* and *Inglis,*) had been on a voyage to *Alexandria,* and had the goods put on board her, to carry them on another voyage to the same place, not for the purpose of conveying them from the plaintiffs to the bankrupts, but that they might be sent by the bankrupts, upon a mercantile adventure, for which they had bought them.    The principle of *Fowler* and *Kymer,* I un-

derstand to be this, that inasmuch as the bankrupts had chartered the vessel for a term of years, and not merely for the voyage, found the stock and provisions, employed and paid the master, had the entire disposition of the ship, and complete control over her, they were *pro tempore* the owners, and that the master, under these circumstances, became the special and exclusive agent of the bankrupts, and that therefore a delivery to him was a delivery to bankrupts themselves; that the *transitus* was at an end, or more properly speaking never commenced, and that the delivery between the vendor and vendee was absolute and final. The special facts, (which are for the first time stated by LAWRENCE, J., in *Boehtlinck* v. *Inglis*, 3 *East*, 396, and which are somewhat differently stated in 1 *East*, 522, and which appear to have been read from the brief in the cause, 7 *T. R.* 442,) that the goods were bought, not for the purpose of conveying them from the plaintiffs to the bankrupts, but that they might be sent by the bankrupts upon a mercantile adventure, was not the ground of the decision, as appears from the opinion of LAWRENCE, J., in the same case. He says, speaking of *Fowler* and *Kymer*, there the delivery was complete; and the facts of that case differ widely from this, (meaning *Boehtlinck* v. *Inglis*,) where *Crane* had no *control* over the ship, and had merely contracted with the master, to employ his ship in fetching goods for him.

In *Englis* and others v. *Usherwood*, 1 *East*, 523, the principle which I have extracted from *Fowler* and *Kymer*, is recognized. The decision of this case, says Lord KENYON, will not trench upon the general rule of law, respecting the rights of stopping goods *in transitu*, but giving the plaintiffs the full benefit of the argument, that the delivery of the goods on board a chartered vessel was a delivery to the bankrupts, still the circumstance of the *Russian* ordinance set forth in this case, varies it very importantly, and takes it out of the general rule. GROSE, J., who, let it be remembered, was the judge who ruled the case of *Fowler* and *Kymer*, and who ought to have understood the grounds of his decision, at least as well as Justice LAWRENCE, says; " I agree to the general rule, that the delivery of goods by the vendors on board a ship chartered by the vendee, is a delivery to the vendee himself." LAWRENCE, J., says, " If this transaction had happened in a·part of this kingdom, the delivery of the goods on board a ship chartered by the bankrupts, would in effect, have been a delivery to him." I do not understand the learned judge, as meaning to convey the idea, that a delivery in a foreign port would not have the same effect; for without doubt the captain would have been as much the special and exclusive agent of his employer, in one case as the other. It is the assertion of a general principle made in reference to the case of *Fowler* and *Kymer*, which had just before been more intelligibly expressed, and with a better knowledge of the grounds of the decision by Justice GROSE, who ruled the cause.

(Bolin and others *v.* Huffnagle, Assignee, &c.)

So also LE BLANC, J., says, "I put the case of *Inglis* and *Usherwood* on the *Russian* ordinance. The laws of *Russia* make all the difference between this and the other cases referred to."

It will be recollected that the whole court were speaking in reference to *Fowler* and *Kymer*, as it then appeared, and not with the view to the subsequent discovery of LAWRENCE, J.

It was once supposed to be a general rule, that the delivery of goods by the vendor on board a ship chartered by the vendee, was a delivery to the vendee himself, so as to preclude the vendor's right of stoppage *in transitu*. And this opinion was entertained on the authority of the case of *Fowler* and *Kymer*. This misrepresentation has, I am inclined to believe, given rise to all the difficulty which has arisen in regard to this case. It is not the delivery on board of a chartered ship, which precludes the vendor's right of stoppage *in transitu*, but it is the delivery to the master, when he can be considered in no other light than as the exclusive agent of the vendee, that it has this effect. Where, for instance, there was a charter party of affreightment, for the voyage, and where the master was not under the control of the vendee, he would be taken as a middle man, a mere means of conveyance between the vendor and vendee; and, in such a case, the *transitus* would not end until the delivery to the vendee himself.

I am aware that Chief Justice PARSONS put the case upon a different principle, but, for the reasons I have stated, I cannot concur with him in the view he has taken. He seems to put the right of stoppage *in transitu* on the destination of the goods or final termination of the voyage, a distinction which with due deference, will be found unsatisfactory in its application, and productive of litigation. Once establish the doctrine that the right depends on such subtle distinctions, and we shall be as much plagued with cases to settle what is meant by the destination of the goods, and final termination of the voyage, as we have been to discover the kind of delivery which terminated the *transitus*. It is best to lay down a plain intelligible rule, easy in its application, and to leave the modification of the rule to the contract of the parties. The distinction for which Chief Justice PARSONS contends, does not seem to have been cordially received by the courts of *Massachusetts*, nor is it supported by the current of cases. Why the final destination of the goods should make the difference is not very intelligible, and has not been explained. In this case, according to the authority of *Stubbs* v. *Lund*, 7 *Mass. Rep.* 453, if the goods, had been shipped for *New Orleans*, the *transitus* would have been at an end, but inasmuch as they were conveyed to *Philadelphia*, the *transitus* continues. The propriety of the rule is certainly not very obvious, nor should mercantile cases depend on such subtle grounds.

That the ultimate destination of the goods does not affect the right of stoppage *in transitu*, is seen from *Dixon* and *Baldwen* 5 *East*, 188. The question always is, not whether they had ar-

(Bolin and others *v.* Huffnagle, Assignee, &c.)

rived at their ultimate destination, but whether the *transitus* was at an end between the parties. In *Dixon* and *Baldwen*, the goods had not arrived at the place of their ultimate destination, but inasmuch as they had between the vendor and vendee, the court decided that the vendor had not the right of stoppage *in transitu.*

In *Richardson* v. *Goss*, 3 *Bos. & Pull.* 127, a delivery to a warehouseman to whom the vendee pays warehouse rent, will take away the right to stop *in transitu*, although the goods have not reached their ultimate destination. Nor is it necessary, in order to prevent the exercise of this right, that the goods should have reached the consignee's place of abode, though they should even have been intended to be ultimately delivered there. And this position is proved by several cases, and particularly by *Wright* v. *Lawes*, 4 *Esp.* 82. A cargo of wines was consigned to the plaintiff, who lived at *Norwich*, and the usual course was to put goods intended for him into lighters, at *Yarmouth*, and forward them to *Norwich:* but his agent received the wines and not having sufficiently large cellars to hold them, deposited them in the cellars of the defendant at *Yarmouth;* and the plaintiff having been there and tasted the wines, that was held a complete delivery; as the carrier ceased to have any further care of them, having delivered them to the plaintiff's agent, according to the bill of lading.

In opposition to these cases, *Coates* v. *Railton*, 6 *Barnw. & Cressw.* has been cited and relied on. Lord TENTERDON, before whom that cause was tried at *Nisi Prius*, certainly put it on the general ground, that as *Lisbon* was the ultimate destination of the goods, they continued to be *in transitu* when they were in the warehouse of the defendants; and that the plaintiffs, therefore, had a right to stop them. On the motion for a new trial, Lord TENTERDON re-asserted the general principle, but further said, that the fact of their having been the *general* agents of the purchaser, as well as warehousemen, did not make any difference. He also seems to have put the case on the special agreement and understanding of the parties, that there should be no absolute delivery, until the goods reached their final destination. If these should be the grounds on which the cause should be deemed to stand, it is unnecessary for me to quarrel with that case. It is nothing more than the assertion of a principle, which I have never disputed; that where there is a middle man between the vendor and vendee, the *transitus* does not end until the goods reach their final destination. Nor has it been disputed that a special agreement may control the general rule of stoppage *in transitu* between the parties. Although I do not deny the principle upon which, I understand, the cause to have been ruled, yet I very much doubt the application of the principles to the facts of the cause. Independently of the great names by which it is supported, I should have supposed that the warehouseman was not the general, but that he was the special and exclusive agent of the vendee; in which case the delivery to him would have

. (Bolin and others *v.* Huffnagle, Assignee, &c.)

been an actual, absolute, special delivery, which clearly would have ended the right of stoppage *in transitu.* This view of the case does not appear to have occurred to the court, nor was it suggested by the counsel, and is, therefore, not thought to interfere with the principles which we have deduced from the cases.

On principle, therefore, and authority, a majority of the court are of the opinion, that the *transitus* was at an end; or perhaps, more properly speaking, did not commence, upon the delivery of the goods to Captain *King*, who was the special and exclusive agent of the vendees.

Huston, J.—The plaintiffs were merchants at *Malaga.* One of the firm, *Gatewood*, was in this country. On the 15th of *July*, 1822, the following letter was addressed to them: "Your Mr. *Gate-wood* we have had the pleasure to see, and received his assurance of your exertions to procure a freight for our brig, should she proceed to *Malaga.*

We should prefer a freight to any port in the *United States*, not farther east than *New York* or south than *Norfolk;* but, if a good freight offers for *New Orleans*, we have no objections. If direct to *Philadelphia*, we have no objections, as we informed your partner, Mr. *Gatewood*, to receive on our account to the extent of about three thousand dollars in first quality dry *Malaga* wine, cask raisins and bloom raisins, an equal proportion of each, for which we will accept your draft in his favour, at four month's sight.

(Signed)          *Sperry* and *Stansbury.*"

On the 23d of *September*, 1822, the plaintiffs shipped the wine and raisins as per order, to be delivered at the port of *Philadalphia*, to Messrs. *Sperry* and *Stansbury*, or to their assigns, they paying freight for the said goods nothing, being the owners of the said vessel. The brig in which the goods were shipped belonged to *Sperry* and *Stansbury*, and was commanded by *Charles King*, master, in their employment.

On the 31st of *October*, 1822, before the arrival of the vessel in the port of *Philadelphia*, and before any intelligence of the said shipment, *Sperry* and *Stansbury* became insolvent, and made a general assignment for the benefit of their creditors. On the 28th of *November*, the vessel arrived in the *Delaware*, and was detained at *Newcastle* by a replevin taken out by the plaintiffs (through their partner *Gatewood*,) and notice given to the master not to deliver the goods. The cargo was sold under an agreement of both parties, and the nett proceeds deposited in bank. This action was instituted to decide the right to that money.

The right to stop goods bought on credit, while on their passage from the seller to the buyer, where the latter becomes insolvent, has been long settled. I shall not go back to the origin of this doctrine nor pretend to go through all the cases, nor decide whether

(Bolin and others *v.* Huffnagle, Assignee, &c.)

it rests on the principle, that a seller who gives goods on credit always does so under the impression that the buyer is not absolutely insolvent, or that when the buyer is totally insolvent, and cannot perform his part of the contract, it is equivalent to his saying he will not perform it, and so the contract, like all others, in such circumstances, is rescinded; or on the plain and obvious injustice of taking one man's goods to pay the debts of another; or whether all these, and other principles, entered into the view of the sages who settled the law.   The principle is settled, but what cases come within it, has not at all times been agreed.   After the goods are in the actual possession of the buyer, and mingled with his other property, the right is agreed to be gone; but when this possession, which puts an end to the right, exists, and when the *transitus* ends, is the question, and the decisions, certainly, are not all consistent. Lord MANSFIELD and Lord KENYON each once said, the goods must come to the corporal touch of the buyer.   Certainly this expression was not used literally, for they may be brought to the warehouse of the buyer, unpacked and sold, and the buyer never have laid his hand on them.   A distinction was taken between actual and constructive possession, and this left the matter as uncertain as before; for what would be considered actual and what constructive possession, was by no means agreed on.   At one time it was said, 3 *Esp. N. P. Rep. 59,* that if goods are put on board of a ship chartered by the buyer, they are in his actual possession, and cannot be stopped. The cause, however, went off on another point. In another cause on the same cargo, 1 *East,* 518, there are to be found *dicta* to the same effect; but here again the cause went off on another point. In 3 *East,* 381, another case on the same cargo, the very point arose, and all the cases, particularly *Fowler* v. *Kymer,* were reviewed, and it was expressly decided that the delivery to a ship expressly chartered for the purpose and sent to the seller, and in which they were loaded by him, did not divest his right of stoppage; and the judge who had decided *Fowler* and *Kymer,* concurred in the decision.   It was next attempted to obtain a decision, that if goods were delivered to a general agent, the right of stoppage was gone.   I shall here notice the case in 4 *Esp. N. P. Rep.* 82, *Wright* v. *Lawes.* The marginal note is not warranted by the case, which is this: *Shevill,* by an agent, bought the wines of *Bamford, Bruin* and Co. in *London,* and they were to be delivered at *Yarmouth.* Before their arrival at *Yarmouth, Shevill* sold them to *Wright,* and on their arrival they were put into a warehouse, until they could be forwarded in lighters to *Wright* at *Norwich.* *Wright* had paid part of the money, and it was proved his purchase was fair.   *Shevill* and his agent, being swindlers, and unable to pay, *Bamford, Bruin* and Co. stopped the wines in the warehouse at *Yarmouth,* and *Wright* recovered them; but here the delivery at the place named by *Shevill,* to the seller was complete. *Shevill* had not only received the wine, but sold it. The passage to *Norwich* was a new one, in consequence of

(Bolin and others *v.* Huffnagle, Assignee, &c.)

the second sale of the wine. The case of *Wright* v. *Leeds*, 3 *Bos. & Pull.* 320, is cited to prove, that a delivery to a general agent puts an end to the right of stopping. *Moisseron* was the general agent of *Le Grand*, and Co. of *Paris*, and in their name purchased goods of *Leeds* at *Manchester*, to be sent to the house of *Wright*, a packer in *London*. They arrived on the 2d of *September*, 1802. *Moisseron* came there, unpacked the goods, and took some of them away, and had the rest repacked. On the 7th of *September*, while the goods repacked were still *at* the packers, *Le Grand* and Co. having failed, *Leeds* came and demanded the goods. *Moisseron* had authority to sell the goods in *London*, or send them to any part of *Europe*, and was not restricted to send them to *Le Grand* and Co. at *Paris*. The seller was told the goods were to be sent to *London*, and sent them there; and the right of stoppage was held to be gone, because the goods had arrived at the place named by the buyer to the seller, and because it depended on *Moisseron* to decide whether he would sell them there or export them, and whether he would send them to *Paris* or some other place. The same principles governed the case in 5 *East*, 175.

These cases were reviewed in a late case, 6 *Barnw. & Cresw.* 422, *Coates* v. *Railton*, and sanctioned; but this distinction is taken, that where a factor or general agent buys goods to be sent to his principal at his residence abroad, the *transitus* is not at an end when the goods come to the possession of the agent, but continues until they reach the principal; but if the agent buys the goods to be sent to a market or sold where he lives, and they may as well be sent to one market as another, there the delivery at the warehouse of the agent, or named by the agent, puts an end to the right of stopping. But here Captain *King* had no power or authority except to carry the goods to *Sperry* and *Stansbury*. Two cases, one in 7 *Mass. R.* 453, *Stubbs* v. *Lund*, and another 9 *Mass. R.* 65, are to the point, and there the law is stated with a perspicuity and precision usual with Chief Justice PARSONS.

On the fullest consideration it seems to me to be settled, that if the goods have arrived at the place named by the buyer to the seller as their destination, as between them, at a place where the buyer has full and absolute power to sell them or send them wherever he pleases, and where they must stay till he directs their destination, the *transitus* between the seller and buyer is at an end, and this whether the goods are in the warehouse of the buyer or of one employed by him for the purpose, whether at the house of a packer designated by him or in a ship. But if the goods are purchased for a particular person, whether by a special or general agent, to be sent to him at a particular place specified to the seller, they are *in transitu*, until they come to the possession of the buyer, at that place, and may be stopped if the purchaser becomes insolvent, whether in the hands of a general or special carrier, or in a warehouse or in a ship, and whether that ship was chartered by the buyer

(Bolin and others *v*. Huffnagle, Assignee, &c.)

for the voyage, or hired by the master, or owned by the buyer; for the passage is not at an end; and how they are passing, whether by land or water, is not material; and I can find no principle which makes goods more in a man's possession or more under his control in his own ship, navigated by his own master, than they are in a ship chartered on freight, for the express purpose of carrying them.

This principle it is, I presume, which has led to the decision, that if the insolvent buyer goes out to sea, and meets the ship, and goes on board and actually touches every parcel, yet the seller may stop the goods after the vessel arrives, and before they are unloaded, or in the warehouse.

A storekeeper in one of our towns comes and buys goods. He loads part in his own wagon and part in a wagon hired for the trip, or to carry at so much per hundred, and instantly goes and assigns all his property.  I see no principle, and on a careful examination I can find no case, which forbids the merchant to follow and stop the goods in the one wagon as well as the other, if he can overtake them before they reach the storehouse of the buyer. In the one and the other, they are on their passage.

The wines and raisins here, were on their passage; and I should suppose the plaintiffs' right not gone.

J. SMITH, concurred, with HUSTON, J.

Judgment for the defendant.