IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 12, 2004 Session

# MID-CENTURY INSURANCE COMPANY v. VIRGINIA WILLIAMS, ET AL.

A Direct Appeal from the Circuit Court for Hardeman County
No. 9551     The Honorable Jon K. Blackwood, Judge

---

No. W2004-00484-COA-R3-CV - Filed January 11, 2005

---

Appellant, an insurance company, appeals from trial court's judgment finding that the business pursuit and home care service exclusions to personal liability coverage in a homeowners insurance policy did not exclude coverage for accidental death of child who drowned in a bathtub while in the care of Appellee. Trial court found that Appellee's arrangement to care for decedent was not a business pursuit or home care service within the meaning of the insurance contract, but rather was an informal type of babysitting motivated by love and/or favor for deceased child's parents. Appellant contends that motivation by profit was irrelevant to whether Appellee was engaged in a business pursuit or home care service, that the evidence preponderates against the trial court's fact findings, and that trial court erred in finding for Appellees. We reverse the judgment of the trial court, finding that the business pursuit and home care service exclusions do bar coverage under the homeowners policy.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. joined and HOLLY M. KIRBY, J., filed a Partial Dissent.

Ronald L. Harper and Alicia Y. Cox of Memphis For Appellant, Mid-Century Insurance Company

Lloyd R. Tatum of Henderson For Appellees, Futrell and Spencer
Harriet S. Thompson of Bolivar For Appellees, Virginia and Jerry Williams

## OPINION

Appellant, Mid-Century Insurance Company, appeals from trial court order finding that the business pursuit and home care service exclusions in a homeowners insurance policy did not exclude

coverage for the accidental death of Patrick Juan Spencer ("Petey"[1]), an approximately one-year-old child who died by drowning in a bathtub in the home of Ms. Virginia Williams ("Ms. Williams"), who was caring for him at the time. Finding that the trial court erred in concluding that Ms. Williams was not conducting a business pursuit or home care service, we reverse the judgment of the trial court.

## I. PROCEDURAL HISTORY

On September 23, 2002, Appellant, Mid-Century Insurance Company ("Mid-Century"), filed a Complaint for Declaratory Judgment seeking a determination that the homeowners insurance policy it issued to Appellees, Jerry and Virginia Williams ("the Williamses"), did not furnish personal liability coverage for the death of Patrick Juan "Petey" Spencer, who died accidentally in their home on October 4, 2000. On October 23, 2002, Appellees, Virginia and Jerry Williams, filed an Answer to Complaint for Declaratory Judgment. On December 12, 2002, Takila Futrell and Patrick Juan Spencer, the parents of Patrick Juan Spencer, filed a Motion to Intervene as Defendants in the declaratory judgment action and simultaneously filed a Complaint in Intervention. On September 9, 2003, the trial court entered an Order Granting Leave to Intervene as Party Defendants and allowed Ms. Futrell's and Mr. Spencer's Complaint in Intervention to serve as an answer on their behalf. A trial on the declaratory judgment action was held in the Circuit Court of Hardeman County on January 22, 2004. An Order was entered on January 27, 2004 finding that the business pursuit and home care service exclusions of the homeowner's policy were inapplicable here. Mid-Century filed its timely Notice of Appeal on February 17, 2004.

## II. FACTS

In late 1999, Virginia Williams and her husband, Jerry Williams, bought a house at 385 Dixie Hills Road in Bolivar, Tennessee. When they bought the house, the Williamses purchased a Special Form Homeowners Package Policy issued by Mid-Century Insurance Company under policy number 66918971129. Not long after the Williams moved into their house, Ms. Williams began serving as a caregiver for her four grandchildren (the children of her daughter, Regina) while her daughter was working. In connection with her childcare responsibilities for these grandchildren Ms. Williams received public assistance under the Aid for Families with Dependent Children (AFDC) program, through the Southwest Human Resource Agency. In August of 2000, Ms. Williams's cousin, Daisy Futrell, contacted Ms. Williams and explained that her stepdaughter Takila Futrell ("Ms. Futrell") needed a backup babysitter for her two children, Quisha Spencer, who was four years old, and Petey, who was almost one year old at the time. Ms. Williams agreed to watch Ms. Futrell's children.

On the morning of October 4, 2000, Ms. Futrell dropped off Petey and Quisha at the Williams house on Dixie Hills Road. After Ms. Williams had taken a bath and had put two older children in the bathtub, she was summoned by children in the home and found Petey partly

---

[1] Because the decedent, Patrick Juan Spencer, is referred to throughout the record as "Petey," we will refer to him as "Petey" in this opinion for the sake of clarity.

submerged in water in the bathtub. He died later at the Regional Medical Center in Memphis. Because Appellant challenges the credibility of Ms. Williams and the fact findings of the trial court, we will review Ms. Williams's testimony at different stages in this litigation, and the trial court's judgment, in some detail.

**A.      Ms. Williams's March 11, 2002 deposition testimony**

On September 27, 2001, Ms. Futrell and Patrick Spencer named the Williamses in a wrongful death lawsuit filed in the Circuit Court of Hardeman County, Tennessee. The plaintiffs alleged that Petey was left unattended by Mrs. Williams, and that he fell into a bathtub and drowned during the time when he was left unattended. The complaint further alleged that Mrs. Williams was negligent in failing to exercise ordinary care in supervising the minor child and that she failed to exercise reasonable and ordinary care in removing any attractive nuisance from the premises. The complaint also alleged that "it was the duty of the defendants to exercise reasonable and ordinary care in monitoring said child and keeping said child from endangering himself." On March 11, 2002, Ms. Williams was deposed by the plaintiffs' attorney, Lloyd Tatum. During that deposition, Ms. Williams gave an account of the events leading to Petey's death and the nature of the childcare arrangement that existed between herself and Ms. Futrell.

When asked how many times she had cared for Petey in her household, Ms. Williams stated that he had been in her household every week since February or the first of March in 2001, and that she cared for him every day, Monday through Friday. Ms. Williams stated that the parents of her grandchildren did not pay her for childcare, but that Ms. Futrell paid her $60 a week. She stated that she arrived at the $60 a week figure because she charged $30 for each child. She stated that Ms. Futrell supplied the diapers needed for Petey. She stated that she cared for Quisha and Petey every day, and that she cared for Petey all day. When asked how Ms. Futrell paid her, Ms. Williams stated that she always paid her in cash and almost always paid her on Fridays. Ms. Williams stated that her fee for keeping the two children never varied: "[i]t didn't go down, it didn't go up." Ms. Williams agreed that $60 a week "probably" amounted to close to a dollar an hour for keeping Petey and Quisha. Ms. Williams testified that she never had a written contract with Ms. Futrell. If Ms. Futrell did not need her to keep Petey and Quisha on a given day, she would deduct $10 from what Ms. Futrell owed her for that week. She testified that she fed the children breakfast, lunch, and snacks at her home. Ms. Williams testified that she did not consider her receipt of AFDC funds for keeping her grandchildren to be a way of making a profit. She testified that she loved Petey and would have kept him even if she had not gotten paid. Ms. Williams suggested that she may have lost money by keeping Petey and Quisha for $60 a week. She stated that she had never conducted a business in her home.

**B.      Ms. Williams's August 27, 2003 deposition testimony**

On September 23, 2002, Mid-Century Insurance filed a Complaint for Declaratory Judgment seeking a determination that the insurance policy it issued to defendants, the Williamses, did not furnish liability coverage for the accidental death of Petey. As part of this declaratory judgment

action, on August 27, 2003, Mrs. Williams was deposed by Ronald Harper, counsel for Mid-Century. During her deposition by Mr. Harper, Ms. Williams once again gave an account of the events leading to Petey's death and the nature of the childcare arrangement that existed between herself and Ms. Futrell.

Ms. Williams testified that Ms. Futrell was "not really" paying her to keep Petey and Quisha. She said that Ms. Futrell only paid her "[w]hen she [Ms. Futrell] felt like it." Ms. Williams testified that $60 a week was only what she expected Ms. Futrell to pay, but that "she didn't do that .... I'm just saying that $60 was what I would have liked to have received." Ms. Williams explained that, in her prior deposition, she had only meant that she *expected* Ms. Futrell to pay $60 a week, not that she actually received it. On cross-examination by Ms. Futrell's attorney, Ms. Williams explained that she was very upset during the March 11, 2002 deposition, and that she had difficulty talking about the situation. She testified that she now had a better recollection of events leading to Petey's death due to counseling she was receiving with her pastor.

## C.    Ms. Williams's January 22, 2004 trial testimony

The trial of the declaratory judgment action was held on January 22, 2004. This trial was the third time Mrs. Williams gave testimony about the events leading to Petey's death and the arrangement she had with Ms. Futrell to care for him. She testified that she did not keep Petey in her house every day. When confronted with her March 2002 deposition testimony in which she testified that she had kept Petey every day, Ms. Williams said she was "so upset, I don't remember what I said or did." Ms. Williams testified that she did not keep Petey in exchange for money from Ms. Futrell, stating, "[s]he didn't pay me anything," and later stating, "she didn't pay me no money." Ronald Harper, the attorney examining her, confronted her with the inconsistency between her statement that Ms. Futrell never paid her any money, and her prior statement (in the March 2002 deposition) that Ms. Futrell almost always paid her on Friday. Ms. Williams testified that Ms. Futrell paid her on Friday "[w]henever she paid me." Ms. Williams was once again asked whether Ms. Futrell paid her $60 a week. In response, Ms. Williams testified, "I told her if she paid me anything, I would like to get $60 a week if I was keeping him a week." Asked whether Ms. Futrell ever paid her $60 a week, Ms. Williams stated, "No, she didn't. No. ... I'm telling you she did not pay me no $60 a week." Asked how she came up with the figure of $60 a week, Ms. Williams testified, "Where I got that from, it's just like if I was going to keep your child, I would tell you ... you're going to pay me $60 a week.... I don't know whether you're going to give it to me or not. I just expect for you to do it."

## D.    The trial court's judgment

At the conclusion of the trial on the declaratory judgment action, the court entered the following Order:

> The Plaintiff, Mid-Century Insurance Company, has brought this declaratory action for the Court to determine if an exclusion in a homeowner's policy the plaintiff issued to defendants is applicable. If so, Mid-Century's policy does not cover a tragic

death of a child that accidentally drowned at defendants' home. The decedent, Patrick Juan Spencer, was in the home of the defendants when the child accidentally fell into a bathtub and drowned. The parents filed suit for negligence against the defendants. When the accident was reported to Mid-Century, the plaintiff denied coverage based on the following exclusion:

> "We do not cover bodily injury ... which arises from or during the course of business pursuits of an insured... or (4) results from the legal liability of any insured because of home care services provided to any person on a regular basis... Regular basis means more than 20 hours per week."

At the time of the incident, it is uncontradicted that Mrs. Virginia Williams kept her four grandchildren while her daughter was at work. Mrs. Williams was receiving $300.00 per month for these services from Southwest Resources, a Department of Human Services facility. It is also uncontradicted that these four grandchildren were living in Mrs. Williams's home, along with her daughter. Mrs. Williams's husband did not know that Mrs. Williams was receiving the payment from Southwest.

Before the Court can make further findings, Mrs. Williams' testimony must be resolved. She gave two depositions, as well as her testimony at trial. Her testimony at trial was thoroughly contradicted by her statements made in her depositions. During her depositions, she made statements to the effect that she took care of decedent on a regular basis, charged a fixed fee for her services, and that the services began six to eight months prior to the accident. At trial, she contradicted those previous statements, claiming she was upset and could not remember her answers at the depositions. Initially, it would appear that she should be discredited as a witness. However, the Court, upon further reflection, is convinced that Mrs. Williams is overcome with grief for the death of this child. She appears to hold herself responsible for the accident. She had left the young child alone while two other children were bathing. It is the Court's impression that Mrs. Williams's statements, not only in her depositions, but also at trial, carry very little weight.

THEREFORE, THE COURT MAKES THE FOLLOWING FINDING:
(1) The decedent was not a family member of the Williams.
(2) That the arrangement for Mrs. Williams to look after the decedent began in late August and lasted until the decedent's death.
(3) That the child would be dropped off at Mrs. Williams's home, and would later be picked up by another babysitter.
(4) This arrangement with Mrs. Williams began when one of the mother's other babysitters became unavailable at various times. Prior to this arrangement with Mrs. Williams, the mother depended upon three other babysitters.
(5) This arrangement lasted for six weeks.

(6)     That the total amount of compensation received by Mrs. Williams was approximately $25. The money was given by the mother to defray expenses. This was not an arrangement for profit.

(7)     That the decedent stayed with Mrs. Williams on or about seven times during this period.

(8)     The mother never called Mrs. Williams in advance to inform her that she was bringing the child. She simply left the child at Mrs. Williams's home early in the morning, until another babysitter could pick the child up.

Based on the foregoing, the Court concludes that the arrangement with Mrs. Williams and the decedent's parents was an informal type of babysitting. This babysitting was not performed in conjunction with Mrs. Williams's childcare of her four grandchildren for which she received compensation. Mrs. Williams was not motivated in making a profit by keeping the decedent; her motive was more from love and/or favor to decedent's mother.

The plaintiff has failed to prove by a preponderance of the evidence that defendant's relationship or arrangement with the decedent was part of a business pursuant to a home care service provided on a regular basis.

WHEREFORE, THE COURT FINDS in favor of the defendant, in that the exclusion of the home owners policy is not applicable.

It is the trial court's judgment in favor of Appellees, the Williamses, that forms the basis of the present appeal.

### III. ISSUE

Appellant presents the following issue for review:

Whether the trial court committed reversible error in awarding the Defendants/Appellees coverage under their Special Form Homeowner's Insurance Policy, issued by Plaintiff/Appellant Mid-Century Insurance Company under policy no. 66918971129, for the wrongful death of a minor child in their home.

### IV. STANDARD OF REVIEW

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d). We further note that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their

manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, **910 S .W.2d 412, 415 (Tenn.1995)**; *Whitaker v. Whitaker*, **957 S.W.2d 834, 837 (Tenn.App.1997)**. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.*; *In re Estate of Walton v. Young*, **950 S.W.2d 956, 959 (Tenn.1997)**. However, in reviewing documentary proof such as deposition testimony, "all impressions of weight and credibility are drawn from the contents of the evidence, and not from the appearance of witnesses and oral testimony at trial." *Wells v. Tennessee Board of Regents*, **9 S.W.3d 779, 783-784 (Tenn. 1999)**. As a result, appellate courts may make an independent assessment of the credibility of the documentary proof it reviews, without affording deference to the trial court's findings. *See Corcoran v. Foster Auto GMC, Inc.*, **746 S.W.2d 452, 456 (Tenn.1988)**. This rule is premised on the fact that appellate courts are in just as good a position as the trial court to judge the credibility of witnesses who provided the proof. *See Elmore v. Travelers Ins. Co.*, **824 S.W.2d 541, 544 (Tenn.1992)**.

## V. ANALYSIS

In this appeal we must determine whether the trial court erred in concluding that Petey's death was covered under the Williamses' homeowner's insurance policy. Mid-Century contends that there are two provisions in the homeowner's policy that exclude coverage for Petey's death, and contends that the trial court erred in finding that Appellant failed to show, by a preponderance of evidence, that Petey's death occurred in circumstances under which coverage is excluded. The Williamses argue that Mid-Century failed to meet its burden of proof and that the trial court's judgment rested upon a credibility determination and should not be disturbed by this court.

**A.** **The exclusions from personal liability relied upon by Mid-Century in seeking to deny coverage for Petey's death**

Mid-Century Insurance Company contends that two exclusions contained in the homeowners policy purchased by the Williamses are applicable in excluding coverage for Petey's death. The scope of personal liability coverage provided by the policy is set out in the following provision of the contract:

> **Coverage E — Personal Liability**
> We pay those damages which an **insured** becomes legally obligated to pay because of **bodily injury** or **property damage** resulting from an **occurrence** to which this coverage applies.
>
> At our expense and with attorneys of our choice, we will defend an **insured** against any covered claim or suit. We are not obligated to pay defense costs, including attorneys' fees of any claim or suit where you select an attorney not chosen by us because there is a dispute between you and us over coverage. We may investigate and

settle any claim or suit that we consider proper. Our obligation to defend any claim or suit ends once we have paid our limit of liability.

(Emphasis in the original.) Both of the exclusions relied upon by Appellant are exclusions to this personal liability coverage. The first exclusion Mid-Century relies upon reads as follows:

**Applying to Coverage E — Personal Liability**

We do not cover:

1.  Liability of an **insured** assumed under any contract or agreement relating to a **business** of an **insured**. Liability of **persons** other than an **insured** assumed under any contract or agreement, whether **business** or non-business, is not covered. Liability of any agreement between an **insured** and a corporation or association of property owners is not covered.

(Emphasis in the original.) The second exclusion Mid-Century relies upon reads as follows:

**Applying to Coverage E and F — Personal Liability and Medical Payments to Others**

We do not cover **bodily injury** or **property damage** which:

1.  Arises from or during the course of **business** pursuits of an **insured**.
2.  Results from the rendering or failure to render **business** or professional services.
3.  ...
4.  Results from the legal liability of any **insured** because of home care services provided to any **person** on a regular basis by or at the direction of:
    a.  any insured
    b.  any employee of any **insured**
    c.  any other **person** actually or apparently acting on behalf of any **insured**.

Regular basis means more than 20 hours per week.
This exclusion does not apply to:
a.  home care services provided to the relatives of any **insured**;
b.  occasional or part time home care services provided by any **insured** under 21 years of age.

(Emphasis in the original.) It is apparent that, under these exclusions, coverage for Petey's death will be excluded if Ms. Williams's liability for his death were:

1.      "assumed under any contract or agreement relating to a business of an insured,"

2.      "[arose] from or during the course of business pursuits of an insured," or

3.      "[r]esult[ed] from the legal liability of any insured because of home care services provided to any person on a regular basis by or at the direction of ... any insured."

Having established the terms of the exclusions relied upon by Mid-Century, we now proceed to review the fact-findings that provided a basis for the trial court's judgment.

## B.    The trial court's findings of fact

A fiercely contested issue at trial was the precise nature of the child care arrangement between Ms. Williams and Ms. Futrell. Ms. Williams sought to characterize the arrangement as an informal one in which she cared for Petey as a favor to Ms. Futrell and maintained that she was paid only a small amount of money to reimburse her for her expenses. Confronted with earlier statements, particularly her statements in her March 11, 2002 deposition in which she seemed to suggest she was regularly paid the amount of $60 per week to care for Petey and Quisha, Ms. Williams explained that she had, in fact, only *expected* to be paid $60 a week and that Ms. Futrell never actually paid her that amount. She also repudiated her statements in her earlier testimony in which she had suggested that she had cared for Petey and Quisha on a daily basis. Ms. Williams accounted for these discrepancies by explaining that she had been very upset when giving the deposition testimony and could not recall what she had said then.

Mid-Century contends that the apparent discrepancies in Ms. Williams's deposition and trial testimony are evidence of deliberate deception and collusion between herself and Petey's parents. Mid-Century maintains that Ms. Williams changed her testimony after the March 11, 2002 deposition because she learned that Mid-Century was likely to deny any claim for Petey's death under the business pursuit and home care exclusions to personal liability coverage in the Williams homeowners policy. Mid-Century urges this Court to conclude that the evidence preponderates against the trial court's fact-findings.

As stated in Section IV, *supra*, we presume the trial court's findings of fact to be correct and will not disturb them unless the evidence, as reflected in the record on appeal, preponderates against these findings of fact. In this case, we agree with Mid-Century that the evidence preponderates against the trial court's fact-finding in this case, particularly the trial court's finding that the child care arrangement under which Petey died was not an arrangement for profit. The record shows that Ms. Williams had received AFDC payments of approximately $300 a month for the childcare services she performed for her daughter Regina's children.[2] There was also a preponderance of

_____

[2]     Although documents introduced into evidence at trial do not specify which children's care the AFDC payments pertained to, testimony at trial persuades us that these payments pertained only to Ms. Williams care for
(continued...)

evidence that Ms. Williams had received regular payments of $60 per week as compensation for keeping Petey and Quisha. Although the AFDC payments were not compensation for Ms. Williams's caring for Petey and Quisha, we believe the AFDC payments, coupled with her expectation of compensation by Ms. Futrell for keeping Petey and Quisha, help to reveal Ms. Williams's motive in performing such services. We conclude that the evidence preponderates against the trial court's finding of fact that this arrangement was not conducted for profit, and we revise the trial court's fact finding to reflect that Ms. Williams did conduct this arrangement for profit.[3]

We also conclude that the evidence preponderates against the trial court's fact finding concerning the duration and frequency of Ms. Williams's caring for Petey. In her March 11, 2002 deposition testimony, Ms. Williams testified that the arrangement began in February or early March of 2001. She further testified, at different points in the same deposition, that she kept Petey Monday through Friday of every week. We conclude that this testimony is credible and that the evidence suggests strongly that Ms. Williams engaged in deliberate obfuscation in her later testimony in an effort to avoid the consequences of the business pursuit and home care service exclusions that were relied upon by Mid-Century in its declaratory judgment action. We revise the trial court's findings of fact on the duration and frequency of the childcare arrangement under which Petey died; we conclude that the arrangement lasted approximately seven months, and that for much of that time Ms. Williams kept Petey all day, on a daily basis excluding Saturdays and Sundays.

While it is not inconceivable that Ms. Williams would be so upset at her March 2002 deposition that she was unable to give a coherent account of the events leading up to and including Petey's death, there was such striking detail and specificity in her March 2002 testimony, concerning the payment arrangements, duration, and frequency of her child care arrangement with Ms. Futrell, that we conclude the trial court erred in failing to give this testimony great weight. The Williamses' contention, that her statements had little or no credibility due to her emotional state, strikes this Court as implausible, given the highly detailed and nuanced account of the childcare arrangement that she gave in her testimony. The testimony of Ms. Futrell at trial does not, in our estimation, carry as much weight as Ms. Williams's March 2002 testimony, given the relative proximity in time of Ms. Williams's testimony to Petey's tragic death.

## C.    Interpretation of the homeowners insurance policy

---

[2](...continued)
Regina's children, not to Petey and Quisha.

[3]    At trial, Ms. Futrell testified that she paid Ms. Williams no more than $25 or $30 during the entire period from August of 2001 to the time of Petey's death. Ms. Futrell further testified that Ms. Williams kept Petey approximately seven times. Ms. Futrell refused to characterize her relationship with Ms. Williams as a business relationship, but said, "Mrs. Williams [was] doing me a favor." Balancing this testimony against the very different account Ms. Williams gave in her March 2002 deposition, we conclude that the evidence preponderates against Ms. Futrell's account.

Our conclusion that Ms. Williams was motivated by profit in caring for Petey does not, in itself, resolve the question of whether coverage for Petey's death is excluded from the homeowners policy at issue in this case. It is possible that Ms. Williams's activities, even if she were motivated by profit, nevertheless did not constitute a business pursuit or home care service under the terms of the exclusions relied upon by Mid-Century, and therefore would not preclude coverage under the policy. We are required to interpret the contract to determine whether it applies to the facts of this case, in light of our conclusion that the evidence preponderates against some of the trial court's findings of fact.

In construing insurance contracts, this Court is obligated to attempt to determine the intent of the contracting parties, and because the policy was drafted by the insurance company, we must resolve any ambiguity and doubt in favor of the insured. *NSA DBA Benefit Plan, Inc. v. Connecticut Gen. Life Ins. Co.*, **968 S.W.2d 791 (Tenn.App.1997**). Where the language of an insurance policy is reasonably susceptible of two meanings, we are obligated to give the particular language the interpretation most favorable to the insured. *Id.* at 795. Ambiguity in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one. *Id.*

We conclude that the language of the contract is not ambiguous. Our task, then, is to determine whether the childcare arrangement under which Petey died constituted a business pursuit or home care service as provided in the exclusions relied upon by Mid-Century. In determining whether the childcare arrangement was a business pursuit, we are guided by the reasoning of another panel of this Court in the case of *Allstate v. Godsey*, **No. 03A01-9107CV243, 1991 WL 261873 (Tenn. Ct. App. Dec. 13, 1991)**. In deciding whether a similar exclusion barred coverage for the loss of a boat, this court in *Godsey* cites with approval the majority rule that "a pursuit is a business only if (1) there is a motive for profit AND (2) it is continued or regular activity." *Id.* at *3.

We have concluded that the childcare arrangement between Ms. Williams and Ms. Futrell was motivated by profit. We further conclude that it was a continued or regular activity, in view of our revision of the trial court's fact findings concerning the duration and frequency of the arrangement. We therefore hold that the childcare arrangement at issue in this case was a business pursuit, and that the trial court erred in concluding that the business pursuit exclusion in the homeowners policy did not bar coverage in this case. We further conclude that the arrangement constituted a home care service within the meaning of the home care exclusion in the homeowners policy at issue here, and that the trial court erred in concluding that the home care exclusion did not bar coverage here.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed. We hold that both the business pursuit exclusion and the home care service exclusion bar coverage by the homeowners insurance policy at issue in this case. Costs are assessed to the Appellees, Virginia and Jerry Williams.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.