NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0446n.06

No. 21-5186

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Sep 30, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| HOWARD ANTHONY JESMER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| ERIE INSURANCE COMPANY, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SUTTON, Chief Judge; McKEAGUE and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff Howard "Anthony" Jesmer (Jesmer) appeals the grant of summary judgment against him in this insurance coverage dispute. Jesmer argues that the district court erred in concluding that his answer to a question on an insurance application rendered his policy void under Tennessee law. We AFFIRM.

**I.**

**A.**

This action concerns coverage under an insurance policy issued to Jesmer by Defendant-Appellee Erie Insurance Company (Erie). On January 30, 2018, Jesmer applied for property insurance to cover "comprehensive perils" to his home at 310 Fields Drive in Arlington, Tennessee.[1] R. 24-5, PID 147. As part of the application process, Jesmer and his father, Howard

---

[1] As Jesmer notes in his brief, the application signatories mistakenly dated the application "January 30, 2017," when the correct date was January 30, 2018. The district court also cited this incorrect date. The policy's stated "origin date" is "02/2018," and the policy period extended from February 1, 2018 to February 1, 2019. R. 24-5, PID 147.

Jesmer (Howard), met with an Erie agent at 310 Fields Drive. Jesmer answered the insurance application's questions about the property. As Jesmer answered the questions orally, the insurance agent completed the written questionnaire. Jesmer answered "no" to the question "Is Applicant conducting any business or occupational pursuits at the premises?" *Id.* at PID 148. The application required that applicants provide "true and complete answers to the questions in this application" and warned that "[a]n incorrect answer, intentional or not, to any information may jeopardize [Erie's] acceptance of this application." *Id.* at PID 148; R. 25-1, PID 168–69. Jesmer and the agent signed the completed application. Jesmer "glanced" at the application before signing it. R. 25-1, PID 169–70. Erie issued a policy on the 310 Fields Drive property providing coverage for certain residential and property losses from February 1, 2018 to February 1, 2019.

In October 2018, Jesmer filed a timely proof of loss under the insurance policy stating that a "fire of unknown origin [had] completely burned [his] dwelling and all its contents." R. 1-2, PID 5. Jesmer claimed $760,732.96 in covered losses. Erie denied Jesmer's claim, and its agent subsequently informed Jesmer's counsel that the claim had been denied, in part, because

> [a]t the time the application for insurance was completed, Mr. Jesmer was working in a business owned by his father known as H&M Recycling. That business was being operated from the Insured location which involved keeping tow trucks and vehicles on the premises. After Mr. Jesmer's father moved from the insured location, Mr. Jesmer continued the business from the premises.[2]

R. 1-3, PID 24.

In October 2019, Jesmer sued Erie in state court to recover benefits under the insurance policy, and Erie removed the case to federal court.

---

[2] Erie also informed Jesmer that it had denied his claim due to "post-loss misrepresentations," including disputed ownership of the property and an apparent attempt to sell it. R. 1-3, PID 24. However, these issues were not addressed by the district court and are not before us.

**B.**

It is undisputed that at the time Jesmer signed the insurance application, he was working for his father Howard's towing company, H&M Auto Recycling (H&M), and had been doing so since approximately the age of seventeen. H&M acquires automobiles and either disassembles them for scrap or fixes them for resale. In approximately 2015, Howard moved the business from its previous location in Mississippi to the 310 Fields Drive property. Jesmer testified at deposition that his work for H&M consisted of "picking up vehicles" and driving them wherever directed by his father. R. 24-4, PID 139 ("My dad, he calls me, and he says go pick up this, and I go . . . . I go from Memphis – I can go from Memphis to pretty much anywhere, go to Nashville, over to Oklahoma, everywhere."). H&M paid Jesmer $1,000 in cash weekly to do this work. It is undisputed that Jesmer regularly kept H&M tow trucks at 310 Fields Drive for use when dispatched on a call.

Howard's deposition testimony described a more expansive version of Jesmer's role in the business. Howard explained that Jesmer was "steadily . . . running" the H&M business "at [the 310 Fields Drive] house" while Howard was "opening up the other tow yard in Orange Beach." R. 24-3, PID 130. Howard explained that Jesmer's job was to "run" the business from the property, *id.*, and that it was helpful for Jesmer to live at the house because doing so would prevent people from "stealing" the company vehicles. *Id*. at PID 132–33 (answering "Yeah, [Jesmer] was living there" in response to the question "What was keeping them from stealing things[--]was someone living in the house?"). Howard additionally confirmed that "[e]ight [tow] trucks that [Jesmer] runs" were "operating out of 310 Fields Drive until the fire loss," and then later clarified that "four to eight" tow trucks "always were at 310" at any given time, in addition to "whatever personal vehicles" had been towed there. *Id.* at PID 133–34. Howard also said that the company would

-3-

stow the towed vehicles at 310 Fields Drive "when [a vehicle] c[a]me[] in really late or if [the customer] c[ouldn]'t buy it until the next day or the next week." R. 25-1, PID 178.

Jesmer attested in an affidavit that he "do[es] not have any ownership interest in H&M Recycling," that he works as "a tow truck driver for H&M Recycling," that "[t]he only time a vehicle from a tow was brought back to 310 Fields Drive, Arlington, Tennessee was if it was to[o] late to deliver the vehicle to its desired location," that "[i]f [he] brought a vehicle back to 310 Fields Drive, Arlington, Tennessee it would be delivered to its destination the next day," and that "[v]ehicles were rarely brought to 310 Fields, Arlington, Tennessee." R. 26, PID 183.

Lisa Keller, an underwriter for Erie who was familiar with the insurance policy issued to Jesmer, stated in an affidavit attached to Erie's summary judgment motion that "[h]ad the application submitted by Anthony Jesmer disclosed that he was operating his father's business out of the insured premises the policy would not have been written because Erie Insurance Company's risk of loss would have increased." R. 24-6, PID 151–52.

Based on this record, Erie moved for summary judgment on the ground that Jesmer's insurance policy was void ab initio due to a material misrepresentation regarding business activities on the premises. The district court agreed and granted summary judgment to Erie.

## II.

This court reviews an order granting or denying summary judgment de novo. *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993). Summary judgment is proper only where there are no genuine issues of material fact and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). To prevail on summary judgment, "[t]he moving party need not support its motion with evidence disproving

the non[-]moving party's claim, but need only show . . . that there is an absence of evidence to support the non[-]moving party's case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (internal citations omitted). Conversely, to survive summary judgment, the non-moving party must "present evidence on which the jury could reasonably find for [him]." *Id.* (internal citations omitted). When reviewing the parties' claims, the court "view[s] the evidence in the light most favorable to the non-moving party." *Id.*

Because we exercise diversity jurisdiction we apply Tennessee law to resolve this dispute. *Howell v. Colonial Penn Ins. Co.*, 842 F.2d 821, 822 (6th Cir. 1987). Under Tennessee law, only certain misrepresentations in an application for insurance render a policy void ab initio—that is, nullified from inception. *See* Tenn. Code Ann. § 56-7-103. The pertinent statute states:

> No written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

*Id.* In *Howell v. Colonial Penn Ins. Co.*, we summarized the requirements for establishing a coverage-defeating misrepresentation:

> The courts of Tennessee have had several opportunities to address claims arising under this statute. From these cases it is clear that in order to avoid coverage under the statute, an insurer must prove two things. First, he must prove that the answers to the questions on the application were false. Then, he must demonstrate that the misrepresentation was material, which requires proving *either* that the false answers were given with the intent to deceive the insurer *or* that the false answers increased the risk of loss. *Womack v. Blue Cross & Blue Shield*, 593 S.W.2d 294 (Tenn. 1980). If a misrepresentation is found to increase the risk of loss, the policy is voidable under the statute even if the misrepresentation was innocently made. *Lane v. Travelers Indemnity Co.*, 499 S.W.2d 643 (Tenn. [Ct.] App. 1973); *see also Bagwell v. Canal Ins. Co.*, 663 F.2d 710, 711 (6th Cir. 1981) (per curiam).

> The issues of whether a misrepresentation exists and whether false answers were given with "intent to deceive[]" are questions of fact to be determined by the fact-finder. Tennessee courts have consistently held that the determination of these factual questions should be made by a jury and not by a court on a summary judgment motion, unless reasonable minds could reach only one conclusion. *Womack*, 593 S.W.2d at 296. Once it is determined that a misrepresentation exists, it is a question of law, not fact, for the court as to whether the misrepresentation increased the risk of loss. *Id.; Johnson v. State Farm Life Ins. Co.*, 633 S.W.2d 484, 487–88 (Tenn. [Ct.] App. 1981) (quoting *Broyles v. Ford Life Ins. Co.*, 594 S.W.2d 691, 693 (Tenn. 1980)).

842 F.2d at 822–23.

### III.

For the following reasons, we conclude both that reasonable minds could not disagree that Jesmer's insurance application misrepresented his business and occupational pursuits at the property, and that, as a matter of law, this misrepresentation increased Erie's risk of loss.

### A.

Jesmer answered "no" to the question "Is Applicant conducting any business or occupational pursuits at the premises?" R. 24-5, PID 148. However, Jesmer and his father both testified that at the time of the application, Jesmer regularly stored tow trucks, and sometimes stored towed vehicles, on the premises.

To prove a misrepresentation, the insurer must simply demonstrate that "the answers in the application were false." *Womack*, 593 S.W.2d at 295. When reading the insurance application, "[i]f the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute." *Owensby v. State Farm Fire and Cas. Co.*, No. E2008-01763-COA-R3-CV, 2010 WL 3565705, at *13 (Tenn. Ct. App. Sep. 15, 2020) (citation omitted) (concluding that "the term 'loss' as it was written in the application for insurance . . . [was] neither vague nor ambiguous"). "Whether the insured's answers to the questions on the application are true or untrue

is to be determined by the trier of fact . . . unless the minds of reasonable men could reach only one conclusion as to whether the answers were true or false." *Womack*, 593 S.W.2d at 295.

Here, Jesmer was a salaried employee of his father's company, and he and his father admitted to using the insured premises as the regular home location for multiple tow trucks and occasionally for towed vehicles. The district court determined that under any reasonable reading of the insurance application's literal language, such activity constitutes conducting "business or occupational pursuit[] at the premises."[3] *See Owensby*, 2010 WL 3565705, at *13.

Jesmer raises two arguments in response. The first is that he did not mislead the insurance company because Erie, through its insurance representative, was aware of his business operations at the time he signed the insurance application. The second is that Jesmer's activities cannot be considered "business pursuits" under Tennessee contract law. Neither argument is persuasive.

**1.**

Jesmer argues that he could not have misled Erie regarding any business operations at the premises because Erie's "agent completed the application at the insured premises and would have seen the tow trucks but did not question [Jesmer] when he denied conducting any business or occupational pursuits at the premises." Appellant's Br. at 9. Jesmer cites four cases for the proposition that "this knowledge is imputed to Erie Insurance Company and [it] is [therefore] estopped from rescinding the policy": *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508 (Tenn. 2012); *Bland v. Allstate*, 944 S.W.2d 372 (Tenn. App. 1996); *Griffith Motors Ins. v. Parker*, 633 S.W.2d

_____

[3] Jesmer's father also testified to other business activity at the property—specifically, that Jesmer was "steadily" "running" the business out of the house. R. 24-3, PID 130-34. In the proceedings before the district court, Jesmer failed to respond to his father's testimony about his business activity at the property or otherwise rebut Erie's "statement of material undisputed facts" in support of its motion for summary judgment. The district court concluded that these unrebutted facts are therefore admitted. However, we need not reach this additional conduct (or grapple with what Howard meant by "run the business") to conclude that Jesmer's insurance application contained a misrepresentation, because the conduct Jesmer admitted—storing multiple company tow trucks and towed vehicles on the property—constituted "any business or occupational pursuits at the premises."

319 (Tenn. App. 1982); and *American Gen. Life Ins. Co. v. Gilbert*, 595 S.W.2d 83 (Tenn. App. 1979).

But under Tennessee law, Jesmer, and not the agent, was ultimately responsible for ensuring that his insurance application contained truthful information. *See Giles v. Allstate Ins. Co., Inc.*, 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993) (holding that an insurance policy was void under § 56-7-103 when an applicant provided truthful information to the insurance agent but the agent wrote incorrect information on the application, because "[a]n insured has the duty to read the application for insurance and to verify the information therein stated") (quoting *Montgomery v. Reserve Life Ins.*, 585 S.W.2d 620, 622 (Tenn. Ct. App. 1979)). Jesmer confirmed that he "glanced" at the application before signing it, R. 25-1, PID 169–70, but he would still have been responsible for its content even if he had not read the application at all. *Giles,* 871 S.W.2d at 156.

Jesmer's cited cases do not hold to the contrary. In *Allstate*, an insured instructed his insurance agent to increase the coverage on his van to a higher liability limit. 363 S.W.3d at 516. Despite the agent's assurance that this would be done, the agent mistakenly provided the van with coverage at the lower level. The Tennessee Supreme Court held that the insured did not subsequently "ratify" or "adopt" the agent's mistake by failing to identify the error and continuing to make payments for the incorrect coverage. *Id.* at 516, 521 (concluding that the insured was "lulled into a false sense of security" by the insurance company and "[t]o hold otherwise would place the burden on the insured to discover and protect himself or herself from mistakes of the insurer's agent"). Similarly, in *Bland*, the Tennessee Court of Appeals refused to void a policy for misrepresentations in the application when there was evidence that the insurance agent, "without authority or direction" from the applicant, and when entrusted by the applicant with a blank form, "filled out the application containing the erroneous information and omitt[ed] other significant

information." 944 S.W.2d at 378. Both *Allstate* and *Bland* emphasized that the mistake occurred because of the insured's justified reliance on the insurance agent's independent actions. *Allstate*, 363 S.W.3d at 516, 521; *Bland*, 944 S.W.2d at 378. Additionally, both cases distinguished prior cases in which courts held that the insured assumed responsibility for the mistake by failing to correct a misrepresentation in the policy or application before signing it. *Allstate*, 363 S.W.3d at 522 ("This is not a 'failure to read' case, but one in which the insured instructed his insurance agent to make a change in the insured's insurance coverage, and the agent made a mistake in carrying out that instruction."); *Bland*, 944 S.W.2d at 378 (noting that courts have voided insurance policies where the applicant "allowed the agent to record [a] misrepresentation[] or failed to inform the insurance company after becoming aware of the error").[4]

Jesmer does not argue that the agent misled or deceived him or acted in any way independently of his wishes. Additionally, he had the opportunity to review and sign the insurance application before submitting it to Erie. Accordingly, Jesmer's cases are distinguishable and Tennessee law holds him responsible for the misrepresentations in the application. *Giles,* 871 S.W.2d at 156.

**2.**

Jesmer next argues that his activities on the premises cannot be considered conducting "business pursuits" under Tennessee contract law, citing *Allstate Ins. Co. v. Godsey*, No. 03A01-

---

[4] Jesmer's two remaining cases, *Griffith* and *American Gen. Life Ins. Co.*, are unhelpful. Although both discuss circumstances in which an agent's knowledge is imputed to the principal as a matter of contract law, they involve situations in which the agent's actions or intentions were arguably so adverse to the those of the principal that the agent's knowledge could not be fairly imputed to it. *Griffith*, 633 S.W.2d at 322–23 (reversing the trial court's determination that an errant employee's knowledge of his own bad acts could be imputed to his employer because the employee was not acting on behalf of the employer when he misappropriated its funds); *American Gen. Life Ins. Co.*, 595 S.W.2d at 87–88 (concluding that an insurance agent's knowledge of an insurance-application misrepresentation could not be imputed to the employer when the insured party was aware that the agent was actively concealing the misrepresentation from the employer to enable the insured to obtain coverage). In this case, neither party argues that the insurance agent's interests were adverse to Erie.

9107CV243, 1991 WL 261873 (Tenn. Ct. App. 1991); *Mid-Century Ins. Co. v. Williams*, 174 S.W.3d 230 (Tenn. Ct. App. 2005); and *State Farm Fire & Cas. Co. v. Sparks*, No. W2006-01036-COA-R3-CV, 2007 WL 4277454 (Tenn. Ct. App. 2007). Tennessee courts have applied a consistent framework for interpreting the phrase "business pursuit" in insurance policies: an activity falls within this ambit "only if (1) there is a motive for profit AND (2) it is continued or regular activity." *Mid-Century Ins. Co.*, 174 S.W.3d at 240 (concluding that an insurance applicant engaged in a "business pursuit" when she was paid sixty dollars weekly to provide in-home childcare Monday through Friday).

Erie argues that we need not apply Tennessee's "business pursuit" framework because the cases cited by Jesmer analyze insurance-contract *exclusions* and none address insurance-policy *applications*. Appellee's Br. at 14–15 ("Defendant Erie is not relying on any exclusions contained within the policy, making each of these cases distinguishable. The purpose of a policy exclusion is distinct from the purpose of an application for insurance.") However, Erie does not cite—and we have not found—Tennessee caselaw stating that courts should construe insurance applications that are asserted to render a policy void differently from insurance policy exclusions. Accordingly, we will analyze Jesmer's activities under the established "business pursuit" framework.

**a.**

Jesmer's tow-trucking activities on the premises were business pursuits within the meaning of Tennessee law because they were both motivated by profit and regular or continuous. *Mid-Century Ins. Co.*, 174 S.W.3d at 240. As to profit, Jesmer acknowledged that he received a weekly salary of one thousand dollars from H&M as a tow-truck driver. And, presumably, that salary was supported, at least in part, by the revenue generated by his tow-trucking activities. This is sufficient to establish that Jesmer's tow-trucking activities were motivated by profit. *See*

*Mid-Century Ins. Co.*, 174 S.W.3d at 239 (concluding that the defendant's "regular payments of [sixty dollars] per week as compensation for keeping" the children "coupled with her expectation of compensation" for keeping the children "help to reveal [the defendant's] motive in performing such services").

Jesmer argues that his tow-trucking activities were not motivated by profit because he "had no interest in the business," but was merely an employee "earning $1,000 a week." Appellant's Br. at 13. We acknowledge that an insured's relation to the business would seem to be one relevant factor, but we do not agree it is dispositive. And Jesmer cites no case supporting that it is. The applicable inquiry focuses on whether the individual expected to receive, and received, compensation for that activity. *See Mid-Century Ins. Co.*, 174 S.W.3d at 239.

**b.**

In determining whether Jesmer's profit-motivated activities were "continued or regular," Tennessee courts require that such activities be "'a customary engagement or a stated occupation' of the insured." *State Farm Fire & Cas. Co.*, 2007 WL 4277454, at *9 (quoting *Allstate Ins. Co.*, 1991 WL 261873, at *3). In the most recent Tennessee case to analyze this language, the Tennessee Court of Appeals concluded in an unpublished opinion that two individuals were involved in the "business pursuit" of operating an oil well when they "traveled [only once] to the site of the well" and "were not involved with the day-to-day operations of [it]," but "received periodic profit distributions from" the well company, filed yearly tax documents "reflecting their share of the partnership's income, credits, and deductions," and when one of the individuals "maintained a [well company] checkbook, which he used to pay some of the partnership's monthly bills." *Id.* at *2. The Court of Appeals reasoned that

> even though [defendants] made only one investment into the partnership, they were
> continuously involved with [the well company] thereafter as partners and owners

> of the business and its operating oil well. It was not necessary for them to be physically operating the oil well in order to be engaged in the business of [the well]. We find that [defendants] have been customarily and continuously engaged in the business since their initial investment in 1985 . . . . This was not an isolated, singular transaction or a "one-time" deal, but a continuous and ongoing business pursuit.

*Id.* at *11–12.

In this case, Jesmer argues that "[t]here was nothing going on at the residence except the tow trucks were parked at the residence until Anthony Jesmer was dispatched on a call," Appellant's Br. at 14, and that "vehicle[s] from a tow" were occasionally, though "rarely," "brought back to 310 Fields Drive . . . if it was to[o] late to deliver the vehicle to its desired location." R. 26, PID 183. However, the constant presence of the tow trucks on the property—specifically for the purpose of allowing Jesmer to readily dispatch them from his home—suffices to show that Jesmer's tow-trucking activity on the premises was "a customary engagement or a stated occupation of the insured." *State Farm Fire & Cas. Co.*, 2007 WL 4277454, at *9 (citation omitted). Given the undisputed testimony that at least "four to eight" tow trucks "always were at 310" at any given time, R. 24-3, PID 133–34, we conclude that Jesmer's tow-trucking activity at the premises was not a "one-time deal, but a continuous and ongoing business pursuit" on behalf of himself and H&M. *Compare State Farm Fire & Cas. Co.*, 2007 WL 4277454, at *12, *with Allstate Ins. Co.*, 1991 WL 261873, at *1–3 (concluding that the defendant's boat-dealing was not a "business pursuit" because his license to deal boats and purchase of one boat were together insufficient to demonstrate "continuous and ongoing" activity).

Jesmer argues that the district court's determination that he was conducting a business pursuit at the premises "places all employees that take company vehicles home in jeopardy of losing their insurance coverage." Appellant's Br. at 14. But Jesmer was not simply parking a single tow truck provided for his daily use by his employer as a matter of convenience. He was

-12-

storing multiple tow trucks, and occasionally towed vehicles, on the premises, which establishes a business purpose beyond any that could be attributed to the hypothetical employee he invokes.

Accordingly, we conclude that Jesmer's tow-trucking activities were "business pursuits" conducted on the premises within the meaning of Tennessee law, and that Jesmer's insurance application misrepresented the presence of these pursuits at the insured premises.

**B.**

Having concluded that the insurance application contained a factual misrepresentation, we next turn to whether the misrepresentation was "material"—that is, whether either it was made "with actual intent to deceive" or "the matter [mis]represented increase[d] the [insurer's] risk of loss." § 56-7-103.

To determine whether a misrepresentation increased an insurer's risk of loss, Tennessee courts look to whether the misrepresentation "is of such importance that it naturally and reasonably influences the judgment of the insurer in making the contract." *State Farm Gen. Ins. Co. v. Wood*, 1 S.W.3d 658, 661-62 (Tenn. Ct. App. 1999) (quoting *Seaton v. Nat. Grange Mut. Ins. Co.*, 732 S.W.2d 288, 288–89 (Tenn. Ct. App. 1987)). In determining "the types of conditions or circumstances that the insurance company considers relevant to its risk of loss," courts may rely on both "the questions an insurance company asks on its application" and "the testimony of insurance company representatives to establish how truthful answers by the proposed insured would have affected the amount of the premium or the company's decision to issue the policy." *Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 590–91 (Tenn. Ct. App. 2006) (concluding that "common sense," as well as an underwriter's testimony "that [the plaintiff's] truthful disclosure of his DUI conviction, by itself, would have resulted in an increased premium," was sufficient to find that failure to disclose "would have naturally and reasonably influenced" the

insurer's decision to issue a life insurance policy). Tennessee law does not require the insurer to establish "that the policy would not have been issued if the truth had been disclosed. It is sufficient that the insurer was denied information which it sought in good faith and which was deemed necessary to an honest appraisal of insurability." *State Farm Gen. Ins. Co.*, 1 S.W.3d at 662 (quoting *Loyd v. Farmers Mut. Fire Ins. Co.*, 838 S.W.2d 542, 545 (Tenn. Ct. Ap. 1992)).

In this case, Erie's underwriter provided undisputed testimony that, "[h]ad the application submitted by Anthony Jesmer disclosed that he was operating his father's business out of the insured premises[,] the policy would not have been written because Erie Insurance Company's risk of loss would have increased." R. 24-6, PID 151–52. Additionally, Erie's broad insurance-application question seeking information about "any business or occupational pursuits" conducted on the premises indicates that the company deemed disclosure of all business activity to be "necessary to an honest appraisal of insurability." *State Farm Gen. Ins. Co.*, 1 S.W.3d at 662. In answering "no" to the relevant question, while simultaneously storing tow trucks and occasionally towed vehicles on the premises, Jesmer denied Erie the opportunity to make an informed determination regarding whether, and at what cost, it was willing to insure Jesmer's property. Common sense additionally indicates that the presence of H&M tow trucks and occasionally towed vehicles on the premises would increase the value of the insured personal property and the risk of loss.

Accordingly, we conclude that Jesmer's misrepresentation was material within the meaning of § 56-7-103.

## IV.

Because Jesmer's insurance application contained a material misrepresentation that rendered the policy void under Tennessee law, we AFFIRM the district court.