IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2021 Session

**FLORA SETAYESH v. STATE OF TENNESSEE**

**Appeal from the Tennessee Claims Commission**
**No. K20190352     James A. Haltom, Commissioner**

_____

**No. M2020-01490-COA-R3-CV**

_____

This appeal involves the interpretation of a provision in an employment contract executed by a professor and Nashville State Community College.  The appellant, a tenured faculty member, transitioned from a teaching position to an administrative position and back again, and asserts that Nashville State breached the terms of her employment contract when it refused to pay her 80% of her administrative salary when she returned to a faculty position. The Tennessee Claims Commission held a trial on the breach of contract issue and determined that the contract referred to a Tennessee Board of Regents policy that did not entitle the professor to 80% of her administrative salary, and therefore, the professor's breach of contract action failed.  The Commissioner recalculated the amount of money the professor was owed for her spring 2018 salary.  The professor appeals, asserting that the Commissioner erred in refusing to consider parol evidence in rendering its decision.  We agree with the professor that parol evidence is helpful to understanding the parties' intent as expressed in the agreement, and we reverse the Commissioner's decision.  The case is remanded for calculation of the professor's faculty salary at no less than 80% of her administrative salary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission**
**Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER, and KRISTI M. DAVIS, JJ., joined.

Loyd Garrett Anglin and Loyd Gilbert Anglin, Murfreesboro, Tennessee, for the appellant, Dr. Flora Setayesh.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Blumstein, Solicitor General, and John William Dalton, III, Senior Assistant Attorney General, for the appellant/appellee, State of Tennessee and Nashville State Community College.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

Dr. Flora Setayesh is a tenured chemistry faculty member at Nashville State Community College ("Nashville State"). She has been employed at Nashville State in various capacities since August 2000. In 2014, Dr. Setayesh became a tenured faculty member. On July 11, 2014, Dr. Setayesh and Nashville State President, Dr. George H. Van Allen, executed a contract entitled "Notice of Appointment and Agreement of Employment" for Dr. Setayesh to serve as Interim Associate Vice President for Academic Affairs/Executive Assistant to the President ("2014 Contract"). Her salary was set at $93,481.50. Paragraph 6 of the 2014 contract provided that "[b]oth parties acknowledge that T[ennessee] B[oard of] R[egents] policy governing tenure and salary conversion supersede all language associated by this contract."

On June 30, 2015, Dr. Setayesh and Dr. Van Allen entered into a second contract entitled "Notice of Appointment and Agreement of Employment" ("2015 Contract") that promoted Dr. Setayesh to the permanent position of Vice President for Institutional Effectiveness with an annual salary of $115,000.[1] Paragraph 6 of the 2015 Contract states:

> 6. The following special conditions shall govern this appointment: **Both parties acknowledge that TBR policy governing tenure and salary conversion supersedes all language associated by this contract. It is also understood that Dr. Setayesh, if transferred to a faculty position during FY 2015-2016, may elect the division she is assigned to for the balance of 2015-2016.**

(Emphasis in original). The 2015 Contract also contains a thirty days' notice termination provision.

In September 2017, Dr. Setayesh told Dr. Van Allen she wished to leave her position as Vice President for Institutional Effectiveness and return to a faculty position. Dr. Van Allen was required to get approval from the Tennessee Board of Regents ("TBR")[2] for this change in position. He was told to coordinate Dr. Setayesh's conversion to a faculty role with April Preston, Assistant Vice Chancellor for Human Resources. On September 25,

---

[1] There were two versions of the 2015 Contract. In the first version, the "special conditions" were inadvertently left out. The parties re-signed the 2015 Contract with the "special conditions" quoted above. There is no dispute that this re-signed version of the 2015 Contract is the applicable version of the contract.

[2] The TBR is the governing body of "13 community colleges and 27 colleges of applied technology" in Tennessee. *The TBR Syllabus*, http://www.tbr.edu/board/tbr-syllabus. (last visited Dec. 1, 2021). Tennessee Code Annotated section 49-8-201 sets forth the composition of the TBR's nineteen members. Nashville State is among the community colleges governed by the TBR.

2017, Dr. Van Allen sent Ms. Preston an email stating, "I am requesting that Dr. Setayesh be offered a faculty contract, effective January 1, 2018. Policy requires a minimum of 80% of her current salary be offered. Many are converted at 100%. I am recommending that her faculty salary be 90% of her administrative salary." On October 5, 2017, Dr. Van Allen sent a follow-up email to Ms. Preston reaffirming his request for conversion of Dr. Setayesh's salary. His October 5 email also included examples of scenarios in which the "80% Rule" applied to other employees' transitions from administrative roles to faculty roles. With respect to Dr. Setayesh's performance, Dr. Van Allen stated, "Dr. Setayesh's performance has been outstanding. Nearly all of our gains in student retention can be attributed to her data analysis and ensuing recommendations. There has been no force equal to hers in promoting student success at [Nashville State]." On October 9, 2017, Dr. Setayesh was notified via Memorandum from the Director of Human Resources that her salary would increase to $131,152.70 based on Nashville State's equity plan.

On October 19, 2017, Ms. Preston provided a Memorandum to Flora Tydings, Chancellor of the TBR, in which she noted that the salary Dr. Van Allen requested for Dr. Setayesh was "higher than the Dean[3] of that department who is in a 12 month position, as well as every other full-time tenured full professor." On October 25, 2017, Chancellor Tydings sent Dr. Van Allen a Memorandum regarding the reassignment of Dr. Setayesh stating, "equity among other faculty should be a determining factor" in setting Dr. Setayesh's salary. The Chancellor's memorandum noted the salary of the highest paid faculty member and the average professor salary, among others. Dr. Van Allen retired on December 31, 2017, and Dr. Kim McCormick assumed the position of Interim President of Nashville State.

On February 2, 2018, Dr. McCormick informed Dr. Setayesh that she was reorganizing several departments, which included eliminating Dr. Setayesh's position. Dr. Setayesh was given the option of becoming the Executive Director for Community & Civic Engagement with a salary of $101,900 or to return to a tenured faculty position with a salary of $89,700,[4] which was the highest faculty pay at Nashville State. Under protest, Dr. Setayesh elected to return to the faculty position with a reservation of rights.

Dr. Setayesh's faculty status was set to begin on February 16, 2018, but her then-current salary would remain in place until March 16, 2018. On February 13, 2018, she received a spreadsheet with calculations of two options to receive the balance of her annual leave payout and her new salary going forward. Dr. Setayesh disagreed with the way her salary was calculated. On February 15, 2018, Dr. Setayesh signed a "Notice of Tenure Appointment and Agreement of Employment for Faculty" agreeing to a prorated academic

---

[3] The "Dean" Ms. Preston was referring to was Jennifer Knapp. There was conflicting testimony about whether Ms. Knapp was actually the dean of the department—Dr. Van Allen stated she was not the dean at the time, but Ms. Preston maintained that she was the dean.

[4] Dr. Setayesh was offered a faculty position making approximately 68% of her administrative salary.

year salary of $44,850.00 beginning March 23, 2018 and ending May 8, 2018. Above her signature, Dr. Setayesh wrote by hand: "I am executing this agreement without waiving any rights and privileges I might have relative to my prior contracts and/or the policies and procedures of the TBR or the institution and under law or equity as relates to my employment."

On August 24, 2018, Dr. Setayesh filed a Claim for Damages in the Division of Claims Administration seeking redress against Nashville State for breach of contract for their failure to award her at least 80% of her administrative salary when she returned to faculty. Nashville State answered and later filed a motion for summary judgment which the Commissioner denied.[5] The case proceeded to trial before the Claims Commission. Six witnesses testified at trial: 1) Dr. Van Allen; 2) Dr. Setayesh; 3) Ms. Preston; 4) Becky Abuorf (Nashville State Payroll Manager); 5) Dr. McCormick; and 6) Chancellor Tydings. The Commissioner stated that, "while some witnesses testified slightly differently regarding their perception of the events, the Tribunal found the testimony of the witnesses to be credible."

Dr. Van Allen testified that he was president of Nashville State for twenty-five years before he retired in December 2017. He testified that he had authority to enter into and negotiate contracts on behalf of Nashville State. He testified he intended for the "special conditions" language contained in both Dr. Setayesh's 2014 and 2015 Contracts to refer to the "80% Rule," which he understood would allow Dr. Setayesh to return to a faculty position at a pay rate of no less than 80% of her administrative salary. Regarding his understanding of the application of the 80% Rule, Dr. Van Allen stated:

> Q. Okay. Now, Dr. Van Allen, what in your view was the final understanding between yourself and Dr. Setayesh with regard to this salary conversion policy?
> A. That after a period of time, if she returned to faculty, she would receive a minimum of 80 percent of her base salary or annual salary.
> Q. Okay. And did you in executing this contract personally assure Dr. Setayesh that if she returned to faculty from her administrative position that she would receive that 80 percent of her fiscal year salary?

---

[5] As reasoning for denying the motion for summary judgment, the Commissioner stated, *inter alia*:

> There is a material dispute regarding the interpretation of TBR General Personnel Policy 5.01.00.00 and whether past practices applied the rule to permanent administrative professionals that returned to the faculty. On one hand, Nashville State has submitted the Affidavit of April Preston, TBR Associate Vice Chancellor for Human Recourses, who attests that TBR General Personnel Policy 5.01.00.00 Sections IV (I) through (K) only refers to temporary administrative duties, while Claimant submitted the Affidavit of President Van Allen, who attests the policy was mandated to apply to all faculty. Those conflicting statements create an issue of disputed material fact that preclude summary judgment.

A. I assured her she would receive a minimum of 80 percent.

. . .

Q. Okay. And based on your knowledge as the president of Nashville State Community College when you entered into this contract, did you consider this provision to be binding on Nashville State as the president of the institution?

A. I certainly did.

Dr. Van Allen was further questioned regarding why he did not explicitly state in the contract that Dr. Setayesh's salary would convert at no less than 80%, and he explained:

Q. . . . The state had brought the contract to your attention and asked you about why you had not explicitly put minimum 80 percent in the contract.

Would you just explain briefly why that was not explicitly included in the contract provision?

A. It was - - you know, a conversion and TBR conversion was part of institutional vernacular. . . . So when I was talking to HR about a conversion, they understood minimum 80 percent. Surely the employee that I'm negotiating the contract with understands minimum 80 percent. It was in our vernacular.

Q. And to your knowledge - - to your knowledge, did you make it clear to [Dr. Setayesh] that that was what was meant by that salary conversion policy?

A. Absolutely.

When asked about whether the "80% Rule" created inequities among staff members, Dr. Van Allen explained that it did and "rightfully so." He testified: "after a tour of duty in administration and you go back to faculty, you're usually beat up, tired, probably lost all your friends. It's just - - it's just difficult. That's why colleges and universities have these conversion policies, sometimes called 'retreat salaries.'" Regarding Dr. Setayesh's effectiveness in her role as Vice President for Institutional Effectiveness, Dr. Van Allen stated that Nashville State "made significant progress in student retention" during her time in the position.

Dr. Setayesh testified that she has a Ph.D. from Vanderbilt, and Nashville State recruited her to "improve the prestige, the reputation of the college" because many of the other faculty members had only a master's degree. From the beginning of her employment with Nashville State, Dr. Setayesh always negotiated the terms of her employment. She agreed to transfer to an administrative role for "as long as [she] was productive and as long as [she] enjoyed being an administrator." She stated that she knew she would eventually want to "go back to [her] first love, which was students." Regarding the "special conditions" language included in her 2014 and 2015 contracts, Dr. Setayesh testified:

- 5 -

Q. Okay. And [the 2015 Contract] included this special condition - -
A. It included this special condition.
Q. - - in regards to TBR's conversion policy?
A. Right. And this was supposed to [] basically summarize the promises, the assurances that I was given. And that meant in our understanding, Dr. Van Allen and I, that that would entitle me to no less than 80 percent of my highest administrative salary if I returned to faculty as a 9-month employee contract.
. . .
. . . I would have never, ever spent a day in this position without being entitled to no less than 80[%] minimum. That was the condition of my employment. And Nashville State got what they wanted out of me, okay?

Dr. Setayesh reiterated that the inclusion of the "special condition" language in her contract "influenced me to basically come and work as the VP of institutional effectiveness to help the college be accredited and move basically - - our retention goes forward and improve our student success and retention and our ranking within the system."

Ms. Preston was called to testify on behalf of the State. She has been employed with the TBR since 2011 and began her current role as associate vice chancellor for human resources and payroll services in November 2017. Ms. Preston testified that in 2017 she received a brief email from Dr. Van Allen regarding Dr. Setayesh's request to transfer from an administrative position to a faculty position. The email stated "I am requesting that Dr. Setayesh be offered a faculty contract, effective January 1, 2018. Policy requires a minimum of 80% of her current salary be offered. Many are converted at 100%. I am recommending that her faculty salary be 90% of her administrative salary." Ms. Preston did not have a copy of Dr. Setayesh's contract at the time, so she called the "college representative and asked and was told there was no stipulations in her contract." In response to Dr. Van Allen's email, Ms. Preston compiled a memorandum for the Chancellor which included a table containing the salaries for other faculty members in the department. Ms. Preston testified regarding her interpretation of General Personnel Policy 5.01.00.00(IV)(I)-(K) and stated that it addresses temporary administrative responsibilities and how to revert and remove stipends. Ms. Preston was asked whether there was a policy for when a permanent administrative employee converts to a faculty position, and she responded, "There is not." Ms. Preston testified there was a policy that requires fair and equitable wages to be paid to employees. She was unaware that Nashville State had a practice of applying an 80% Rule.

Becky Abuorf has been employed by Nashville State for more than 36 years and is the payroll manager. Ms. Abuorf was in charge of calculating Dr. Setayesh's salary for the remainder of the spring semester 2018. Ms. Abuorf testified that she calculated the amount based on prior practice at Nashville State, but there was no specific policy for the calculation.

Dr. Kim McCormick was the interim president after Dr. Van Allen's retirement in late 2017, and she is currently employed at the TBR. Her role as interim president was to "stabilize, reorganize, [and] do what needed to be done to get the college ready for the following enrollment cycle and for the new president." Dr. McCormick was informed by Dr. Van Allen that Dr. Setayesh desired to return to faculty. Dr. McCormick offered Dr. Setayesh a position as executive director of community and civic engagement, but Dr. Setayesh turned the position down, explaining that she could make more money in her faculty role if she taught in the summer. Dr. McCormick testified that the determination of Dr. Setayesh's salary and reorganization of the college were two of the decisions she made as interim president. When asked about whether she was aware of the "special conditions" in Dr. Setayesh's contract, Dr. McCormick responded as follows:

Q. Were you aware that the contract she was converting from to faculty had a salary conversion provision in the contract itself?
A. I see that they have written that both parties acknowledge that TBR policy governing tenure and salary supersedes all language associated by this contract. It is also understood that Dr. Setayesh may choose the division she's going back to.
    However, Dr. Setayesh was administration. And she moved from administration to faculty. That is not the same things as a person who is a faculty member having an extra administrative duty.
Q. Okay. Well - -
A. So the policy for the TBR that governs tenure and salary conversion has nothing to do with her job moving from an administrator to a faculty member.

In determining the appropriate salary for Dr. Setayesh, Dr. McCormick reviewed a memo that had a suggested salary range for Dr. Setayesh, and Dr. McCormick "negotiated, as best I could, the highest salary we could pay her to be fair and equitable to the other employees of that institution." Dr. McCormick admitted a mistake was initially made with the notice provided to Dr. Setayesh, but when it was brought to her attention, "it was corrected."

Dr. Flora Tydings has been employed by the TBR as Chancellor since February 1, 2017. She was previously president of Chattanooga State Community College and Athens Technical College in Athens, Georgia. Dr. Van Allen informed Dr. Tydings in September 2017 that Dr. Setayesh wished to return to faculty in the chemistry department, and he requested that her salary be set at 90% of her administrative salary. Dr. Tydings asked HR and legal to look into it and provide her with salary "ranges." Dr. Tydings received a memorandum from Ms. Preston titled, "Transfer of VP of Institutional Effectiveness to Faculty." Attached to the Memorandum was a chart of salary ranges for the full-time biology faculty members and an email from Ms. Preston to Danny Gibbs, Vice Chancellor for Business and Finance, stating, "There are no special conditions in Dr. Setayesh's current contract that stipulate her salary upon return to another position." On October 25, 2017, Dr. Tydings sent a memorandum to Dr. Van Allen stating that "equity among other

faculty should be a determining factor" in setting Dr. Setayesh's faculty salary. The memo went on to state, "Ms. Setayesh's salary should not exceed the highest paid professor and faculty member which is at $87,279 nor should it be lower than the lowest paid professor which is at $60,944." Dr. Van Allen did not respond to this memorandum before he retired in late 2017. On cross-examination, Chancellor Tydings acknowledged that she did not review Dr. Setayesh's contract prior to sending the October 25 memorandum. She became aware of the "special conditions" in Dr. Setayesh's contract upon receiving communication from Dr. Setayesh's attorney in December 2017.

The Commissioner entered an Order 1) denying Dr. Setayesh's claim for breach of contract related to the conversion of her administrative salary to her faculty salary; 2) granting Dr. Setayesh's claim related to her remaining spring 2018 academic salary and finding Nashville State owed her an additional $16,225.15; and 3) denying her claim for breach of the contract's 30-day notice provision. Specifically, the Commissioner found the 2015 Contract was not ambiguous and did not indicate that Dr. Setayesh's salary would be converted using the "so-called 80% Rule." The Claims Commissioner held that the "special conditions" language in Dr. Setayesh's contract referred to the TBR's written General Personnel Policy 5.01.00.00 IV (I)-(K) ("TBR General Personnel Policy") which did not apply to Dr. Setayesh's permanent position. The Commissioner held that Dr. Setayesh's 2015 Contract "does not say anything about an 80% rule, and the applicable TBR policy does not apply to permanent positions." Next, the Commissioner found Dr. Setayesh was underpaid for the remaining portion of the spring 2018 academic year and determined she was entitled to $33,637.50 instead of $17,412.35. Finally, the Commissioner denied her breach of contract claim based on Nashville State's alleged failure to give thirty days' notice. Dr. Setayesh raises three issues on appeal which we summarize as follows: 1) whether the trial court erred in disallowing extrinsic evidence; 2) whether the trial court erred in its determination that Dr. Setayesh was not entitled to a minimum of 80% of her fiscal year salary upon her return to faculty; and 3) whether the trial court erred in its calculation of damages with regard to her return to a faculty position.

STANDARD OF REVIEW

Appeals from the Tennessee Claims Commission are governed by the Tennessee Rules of Appellate Procedure. *See Bowman v. State*, 206 S.W.3d 467, 472 (Tenn. Ct. App. 2006). Because the Claims Commission hears cases without a jury, this Court reviews the Commission's factual findings de novo upon the record accompanied by a presumption of correctness unless the evidence preponderates otherwise. *Id.* (citing *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991); *Dobson v. State*, 23 S.W.3d 324, 328-29 (Tenn. Ct. App. 1999); *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. Ct. App. 1989)). We review the Claims Commission's legal conclusions de novo with no presumption of correctness. *Turner v. State*, 184 S.W.3d 701, 704 (Tenn. Ct. App. 2005). The interpretation of a contract is a question of law, which we review de novo with no presumption of correctness on appeal. TENN. R. APP. P. 13(d); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM,*

*Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011).

LEGAL CONCEPTS

"'The State of Tennessee, as a sovereign, is immune from suit except as it consents to be sued.'" *Stewart v. State*, 33 S.W.3d 785, 790 (Tenn. 2000) (quoting *Brewington v. Brewington*, 387 S.W.2d 777, 779 (Tenn. 1965)). Pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(L) the State has consented to be sued for "[a]ctions for breach of a written contract between the claimant and the state which was executed by one (1) or more state officers or employees with authority to execute the contract." To prevail on a claim for breach of contract, the claimant must prove: "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

Tennessee's rules of contract interpretation "reflect balance; they demonstrate a definite focus on the written words in the parties' contract, but they also consider evidence related to the situation of the parties and the circumstances of the transaction in interpreting those words." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 692 (Tenn. 2019). While the "written words" of the contract are the "lodestar of contract interpretation" the "common thread in all Tennessee contract cases— the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Id.* at 688, 694 (citing *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016); *Dick Broad. Co., Inc. of Tenn.*, 395 S.W.3d at 659; *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012); *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999)). Of overall importance, and "foundational" to the task of contract interpretation is "the principle that the rules used for contract interpretation 'have for their sole object "to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made."'" *Id.* at 688 (quoting *McNairy v. Thompson*, 33 Tenn. 141, 149 (Tenn. 1853)).

If the language of the contract is "clear and unambiguous" the literal meaning of the words in the contract controls. *Dick Broad. Co., Inc. of Tenn.*, 395 S.W.3d at 659. However, if the terms of the contract are ambiguous, "we must apply other established rules of construction to aid in determining the contracting parties' intent."[6] *Id.* (citing

---

[6] Our Supreme Court has pointed out that some judges and scholars have criticized the "ambiguous versus unambiguous" dichotomy, noting that: "'The problem, perhaps ironically, is that the concept of ambiguity is itself perniciously ambiguous.'" *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 686

*Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 855, 890 (Tenn. 2002)). "'Ambiguity in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one.'" *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 216 (Tenn. Ct. App. 2013) (quoting *Mid-Century Ins. Co. v. Williams*, 174 S.W.3d 230, 240 (Tenn. Ct. App. 2005)). In other words, if the contractual language is "susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the contract." *Shuttleworth, Williams, Harper, Waring & Derrick, PLLC v. Gary K. Smith, Smith, Sabbatini & McLeary, PLLC*, No. W2007-02295-COA-R3-CV, 2010 WL 744375, at *3 (Tenn. Ct. App. Mar. 5, 2010) (citing *Allstate Ins. Co.*, 195 S.W.3d at 611).

Also important to the interpretation of the contract in this appeal is the parol evidence rule. Under the parol evidence rule, "'a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing.'" *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 694-95 (quoting BLACK'S LAW DICTIONARY 1292 (10th ed. 2014)). Although parol evidence cannot "vary, contradict, or supplement" the terms of a fully integrated agreement, it can be used to give context to the language used in the contract:

> "The parol evidence rule does not . . . prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as an aid in the construction of the contract's language, but the evidence may only give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to interpret contractual terms. This is true even if doing so reveals a latent ambiguity in a contract's terms. But whether a court is considering if an ambiguity exists or construing the terms of an unambiguous contract, *surrounding facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else.* As we have often stated in one way or another, understanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement, but it is the parties' expressed intent that the court must determine."

*Id.*, 566 S.W.3d at 697-98 (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018)). When the contract at issue is "fully integrated, general extrinsic evidence of context may be used to interpret the contractual language in line with the parties' intent." *Id.* at 697.

---

n.15 (quoting Lawrence M. Solan, *Pernicious Ambiguity in Contracts and Statues*, 79 CHI.-KENT L. REV. 859, 859 (2004)).

ANALYSIS

In this appeal we must construe an inartfully worded provision of an employment contract in tandem with a poorly drafted personnel policy. Despite conducting a full trial on the breach of contract issue, the Commissioner found that Dr. Setayesh's 2015 Contract was not ambiguous and "accordingly, consideration of parol evidence is not necessary to determine whether a breach of contract occurred." The Commissioner then found that the 2015 Contract incorporated a TBR General Personnel Policy that it found inapplicable to Dr. Setayesh, and ultimately held that her breach of contract action failed. As we previously mentioned, the Commissioner's conclusion is not entitled to a presumption of correctness on appeal; therefore, we review the decision de novo. *See Dick Broad. Co., Inc.*, 395 S.W.3d at 659.

The 2015 Contract contains two separate provisions that reference policies—paragraph 3 and paragraph 6:

> 3. This appointment is made subject to the laws of the State of Tennessee, the policies and requirements of the Tennessee Board of Regents, and the policies and requirements of the institution. It is the Institution's responsibility to publish and distribute policies and requirements. It is the employee's responsibility to become familiar with both. Both are available through the college library and on the Internet.
> . . .
> 6. The following special conditions shall govern this appointment: **Both parties acknowledge that TBR policy governing tenure and salary conversion supersedes all language associated by this contract. It is also understood that Dr. Setayesh, if transferred to a faculty position during FY 2015-2016, may elect the division she is assigned to for the balance of 2015-2016.**

(Emphasis in original). Our task is to determine the applicable "TBR policy governing tenure and salary conversion" referenced in the "special conditions" provision of paragraph 6. This TBR policy is to "supersede[]"[7] all language associated by the contract." The parties purposefully included the "special conditions" language in the contract and intended for the "special conditions" to "govern" Dr. Setayesh's appointment to the position of Vice President of Institutional Effectiveness. We must give the language of Paragraph 6 effect in line with the intent of the parties.

The Commissioner determined that the "special conditions" in paragraph 6 of Dr. Setayesh's 2015 Contract referred to TBR General Personnel Policy 5.01.00.00(IV)(I)-(K).

---

[7] "Supersede" means "[t]o annul, make void, or repeal by taking the place of." *Supersede*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Neither party proffered another written policy of the TBR that referenced salary conversion. At the time the parties entered into the contract, TBR General Personnel Policy 5.01.00.00(IV)(I)-(K) stated as follows:

I. Faculty members may be asked to temporarily assume administrative responsibilities which entail moving from an academic year to a fiscal year contract with the assignment of additional duties. This temporary appointment may be on a long-term or short-term basis but is still considered a temporary appointment subject to this policy. This does not apply when a faculty member is hired into a permanent administrative position such as a deanship which requires a twelve-month contract.

J. Temporary administrative responsibilities may necessitate the awarding of an administrative stipend in addition to the previously established salary. The stipend amount or any other understanding concerning compensation must be set out in a newly-executed contract. The contract
    1. Should include a statement that the stipend is awarded as compensation for additional administrative responsibilities and will be removed at the time the administrative responsibilities end; or
    2. Should otherwise address how compensation would be affected at the end of an administrative appointment.

K. The awarding of an administrative stipend is an issue separate from that of conversion from an academic year to a fiscal year basis. When the conversion is to take place, the institution should just convert the salary from the academic year contract by adding 25% and then adding any stipend amount determined necessary.
    1. The following illustrates the procedure defined above.
        a. A faculty member making $20,000 on an academic contract is converted to a fiscal year contract at a salary of $25,000.
        b. In addition, a $1,500 administrative stipend is added and so indicated because of additional duties. The total amount of salary is then $26,500.
        c. At the time the faculty member serving as administrator returns to a faculty position on an academic year basis, the administrative stipend will end.
        d. The base faculty salary is reduced to an academic year contract at a rate no less than 80% of the fiscal year contract. The institution may choose to exceed the 80% number on the basis for comparable faculty salaries, including rank, merit, length of service, experience, degrees and yearly percentage increase in salary.

Subsection (I) states that faculty members may be asked to temporarily assume administrative duties and that these temporary assignments may be short or long term. Subsection (I) goes on to state "[t]his does not apply when a faculty member is hired into a permanent administrative position such as a deanship which requires a twelve-month contract."

The Commissioner ultimately held that TBR General Personnel Policy 5.01.00.00(IV)(I)-(K) was not applicable to Dr. Setayesh. When interpreting subsection (I), the Commissioner stated, in his order:

Section (I) clearly states '(t)his [section] does not apply when a faculty member is hired into a permanent administrative position such as a deanship which requires a twelve-month contract.' Here, Claimant was hired into a permanent administrative position. Accordingly, the Claimant's breach of contract claim fails.

The Commissioner inserted the word "[section]" into the third sentence of subsection (I) and summarily found that Dr. Setayesh's breach of contract case must fail because she was hired into a permanent position, not a temporary appointment. We are not convinced that the third sentence of subsection (I) renders the remaining subsections of section (IV) inapplicable to Dr. Setayesh. Therefore, our analysis continues.

Subsection (J) discusses the award of a stipend for temporary administrative responsibilities. Subsection (J)(2) states that a contract for temporary administrative responsibilities "[s]hould otherwise address how compensation would be affected at the end of an administrative appointment." Subsection (J)(2) suggests that salary conversion for a temporary administrative appointment could be accomplished through a contractual provision. Nevertheless, subsection (J) does not apply to Dr. Setayesh because she was not awarded an administrative stipend for any temporary administrative responsibilities.

We move on to subsection (K) which begins by discussing the procedure for converting salary from an "academic year to a fiscal year." Again, we are not concerned with converting from an academic year to a fiscal year; rather, we are concerned with the opposite salary conversion—from fiscal year (which applies to administrative positions) to academic year (for faculty positions). Subsection (K)(1)(a)-(b) goes on to illustrate and provide an example of converting a faculty salary to an administrative salary. In subsection (K)(1)(c)-(d), the language switches gears and no longer illustrates the procedure for converting a salary from an academic year to a fiscal year; rather, it discusses the procedure for converting an academic year contract to a fiscal year contract. Subsection (K)(1)(d) is the first provision that could possibly apply to this dispute, and it states:

d. The base faculty salary is reduced to an academic year contract at a rate no less than 80% of the fiscal year contract. The institution may

choose to exceed the 80% number on the basis for comparable faculty salaries, including rank, merit, length of service, experience, degrees and yearly percentage increase in salary.

The Commissioner held that because Dr. Setayesh was appointed to a permanent vice president position, and because subsections (I)-(K) all relate only to temporary administrative appointments, then subsection (K)(1)(d) did not apply to Dr. Setayesh. Essentially, the Commissioner found that the "special conditions" language that the parties intended to "govern" Dr. Setayesh's appointment had no meaning and no applicability to her. This result begs the question, why would Dr. Setayesh and Dr. Van Allen specifically include an inapplicable TBR policy to govern Dr. Setayesh's employment contract?

Under these circumstances, extrinsic evidence of the facts and circumstances surrounding the contract's execution would be helpful as we strive to understand what the parties intended by the phrase: "TBR policy governing tenure and salary conversion." *See Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 697-98; *see also Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 334 (Tenn. 1983) (quoting Restatement of Contracts, § 235(d) and comment)) ("'In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity[,] it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement."). In this case, there is no shortage of parol evidence to consider. Dr. Setayesh and Dr. Van Allen, the parties to the contract,[8]

---

[8] The State did not raise any concern regarding Dr. Van Allen's authority to execute the 2015 Contract on behalf of Nashville State. Dr. Van Allen explicitly testified that he was authorized to negotiate and execute Dr. Setayesh's contract once the TBR had approved the position. He stated:

> In negotiating contracts with any employee, the president has some latitude. All contracts are prepared at the campus level. All these agreements are done by the president or his designee. The - - if you look at the contract . . . the contract is not a college document. The contract is a TBR document. The contract to TBR provides the college - - provides for special stipulations. TBR understands that the presidents have to negotiate conditions of employment beyond the ones stated. And therefore presidents have the authority to do so. . . .

> Q. And you stated that you had the authority to include a special provision such as this one. Do you also testify here today that you had the authority to assure that Dr. Setayesh would get no less than 80 percent of her fiscal year salary if she returned to faculty?

> A. If my - - if my authority - - or the execution of my authority does not exist contrary - - is not contrary to an existing TBR policy or law, I have the authority. In absence of TBR policy or a federal or state law, I have the authority to do these things, yes.

We note that the agreement itself is consistent with Dr. Van Allen's testimony as it has only two signature lines, one for Dr. Van Allen as President of Nashville State and one for Dr. Setayesh as "Appointee."

testified explicitly and unequivocally that they intended for the "TBR policy governing tenure and salary conversion" to refer to the "80% Rule" which derives from subsection (K)(1)(d)[9] of the TBR General Personnel Policy. The parties to the contract both testified consistently that they included the special conditions to ensure Dr. Setayesh would receive at least 80% of her administrative salary when she returned to a faculty position. Dr. Van Allen's testimony at trial regarding his understanding of the terms of the contract is bolstered by every email he sent on the topic before he retired. On September 25, 2017, he sent an email to April Preston regarding Dr. Setayesh's transfer from her administrative role to a faculty role stating, in pertinent part:

> In order to execute a mutually beneficial arrangement, I am requesting that Dr. Setayesh be offered a faculty contract, effective January 1, 2018. Policy requires a minimum of 80% of her current salary be offered. Many are converted at 100%. I am recommending that her faculty salary be 90% of her administrative salary.

Again, on October 5, 2017, Dr. Van Allen sent an email to Ms. Preston stating, in relevant part:

> The recommendation you have under consideration is one affecting the status of Flora Setayesh. My recommendation is based on a history of like actions. In 2001, the college attempted to convert Ted Washington's fiscal contract to an academic contract at 75%. Ted Washington protested, citing TBR policy. The college's H.R. Director, Lori Maddox, was asked to call Debbie Johnson for clarification. Mrs. Johnson stated that Mr. Washington was correct and was entitled to "no less than 80% of his fiscal year contract." Ms. Maddox informed Mr. Washington via the attached email and offered him an academic contract "at a rate of no less than 80%." Thus, since 2001, we have

---

[9] Regarding this written policy, Dr. Van Allen testified:

Q. Dr. Van Allen, very briefly, without going into any of the history of it - - could you just state briefly for the Court what the salary conversion policy is as you knew it to be at the time you entered into this contract.

A. Okay. It's in general - - it's in the general policy we already looked at. I can thumb through and find it. The section that we were instructed to follow - - there's not a page number on here, but it's in - - under K(d).
. . .
Then the base faculty salary is reduced to an academic year contract at a rate of no less than 80 percent of the fiscal year contract. The institution may choose to exceed 80 percent - - the 80 percent number on the basis of comparable faculty salaries, including rank, merit, length of service, experience, degrees, and a yearly percentage increase. That's basically it.

- 15 -

considered the "80% rule" TBR policy and acted in sync. You will find the practice was followed in more recent conversions from fiscal to academic contracts. In both cases, the individuals were removed from their positions due to performance issues. Yet, because of the 2001 ruling, Jennifer Knapp was converted at 85% of her base in 2014, and Judy Kane at 80% of her base in 2004.

The only question which may remain is why the difference in the conversion percentages. In the case of Dr. Knapp and Mrs. Kane, level of performance led to their return to their faculty positions. Both were tenured. In the case of Dr. Setayesh, she is asking, as a tenured-faculty member to be returned to her teaching position in keeping with assurances offered when she accepted administrative duties. One of those was that the "80% rule" was TBR policy and consistently honored and, thus, not subject to institutional manipulation. In reviewing past actions, I concluded and, thus, recommended a 90% conversion rate for Flora Setayesh. Unlike the two cited within this paragraph, Dr. Setayesh's performance has been outstanding. Nearly, all of our gains in student retention can be attributed to her data analysis and ensuing recommendations. There has been no force equal to hers in promoting student success at [Nashville State]. The changes she initiated will, unless undone, continue to have a positive impact on our student population.[10] I am more than willing to add other contributions made by her but her evaluations can be accessed if necessary. Therefore, based on the above-referenced policy interpretation, previous contract conversions, and stellar performance, I am again, recommending Dr. Setayesh be offered an academic contract at 90% of her base salary effective January 1, 2018.

This extrinsic evidence is relevant and illuminates the parties' intent. We find Dr. Van Allen's e-mail and testimony that the "80% Rule" had been previously applied to transitions from permanent administrative positions to faculty positions compelling. Here, the parol evidence provided by Dr. Setayesh and Dr. Van Allen does not contradict the language of the contract; it explains it.

---

[10] Dr. Van Allen's statements about Dr. Setayesh's exceptional performance satisfy the requirement in TBR General Personnel Policy 5.01.00.00(IV)(F) that, "The president shall ensure that all employees shall be paid equal wages or salaries for equal work . . . except where pay differentials are based upon: 1. market factors, 2. a merit or evaluation system, 3. length of service, or 4. any other proper, non-discriminatory basis." Moreover, applying the "80% Rule" to transfers from temporary administrative positions and not from permanent administrative positions makes no sense. It is not fair or equitable to treat a return from a temporary administrative position better than a return from a permanent administrative position. As we have previously noted, Dr. Van Allen testified that "[a]fter a tour of duty in administration and you go back to faculty, you're usually beat up, tired, probably lost all of your friends. It's just – it's just difficult. That's why colleges and universities have these conversion policies."

Dr. Setayesh signed her contracts with the special stipulations in July 2014 and June 2015, well before Ms. Preston, Dr. McCormick, and Chancellor Tydings assumed their current or interim positions. Dr. Van Allen had been head of Nashville State for twenty-five years and testified that he had authority to insert such conditions in contracts. Thus, it appears that the institutional knowledge of the policy lies with Dr. Van Allen who testified that "in the absence of TBR policy or federal or state law, I have authority to do these things. Yes." Dr. Setayesh's situation falls within a gap in the TBR policy.[11] She points to section 5.01.00.00(IV)(K)(1)(d), which concerns temporary assignments. We have been directed to no other policy that addresses the situation. The State contends that if Dr. Van Allen had wanted to include the 80% requirement he could have said so explicitly. In Dr. Van Allen's view, he did so, he just used "institutional vernacular," much like lawyers use "legalese." Dr. Setayesh understood this vernacular to mean "in our understanding, Dr. Van Allen and I, that that would entitle me to no less than 80 percent of my highest administrative salary if I returned to faculty as a 9-month employee contract."

As our Supreme Court pointed out when emphasizing the importance of ascertaining the parties' intent, "judges 'are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge the meaning of the words and the correct application of the language to the things described.'" *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 694 (quoting *Staub v. Hampton*, 101 S.W. 776, 785 (Tenn. 1907)). Above all else, our job is "'to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.'" *Id.* at 688 (quoting *McNairy*, 33 Tenn. at 149). Based on these important considerations and all of the evidence adduced at the trial, including parol evidence that assists us in defining what the parties meant by the terms included in paragraph 6, we find that Dr. Setayesh's contract was breached when Nashville State failed to provide her with at least 80% of her administrative salary upon her transition to a faculty role. When we step into the situation of the parties, view the circumstances surrounding the execution of the contract as they viewed them, and consider the meaning of the words included in the contract as the words were mutually understood at the time the contract was made, the parties' intent could not be more clear: Dr. Setayesh and Dr. Van Allen intended for Dr. Setayesh to return to faculty with a salary not less than 80% of her administrative salary.[12] In refusing to compensate Dr. Setayesh at 80% of her administrative salary, Nashville State breached Dr. Setayesh's 2015 Contract,

---

[11] We note that the TBR has recently promulgated a policy that covers the situation presented in this case, where a faculty member is appointed to an administrative position and later returns to a faculty assignment. *See* TBR General Personnel Policy 5.01.00.00(III)(H)(1)(a) ("Unless the Chancellor approves an exception, an administrator returning or moving to a 9-month faculty position shall not receive a salary greater than the highest-paid 9-month faculty member in the department.").

[12] Because we have determined that Dr. Setayesh's contract was breached when she was not provided at least 80% of her administrative salary upon returning to a faculty position, the remaining issues on appeal are pretermitted.

and Dr. Setayesh is entitled to a recalculation of her salary at a minimum of 80% of her administrative salary from the day she transitioned into her faculty role going forward.

CONCLUSION

For the foregoing reasons, the judgment of the Claims Commission is reversed. The case is remanded to the Claims Commission to determine the amount of salary to be awarded to Dr. Setayesh under the 2015 Contract. Costs of this appeal are assessed against the State for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE